James H.M. Sprayregen      Ryan Blaine Bennett (admitted *pro hac vice*)
Marc Kieselstein      Michael B. Slade (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP      KIRKLAND & ELLIS LLP
601 Lexington Avenue      300 North LaSalle
New York, New York  10022      Chicago, Illinois  60654
Telephone:     (212) 446-4800      Telephone:     (312) 862-2000
Facsimile:     (212) 446-4900      Facsimile:     (312) 862-2200

Attorneys for the Appellants

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re:* | ) |
| | ) |
| | ) |
| LEAR CORPORATION, *et al.,* | ) |
| | ) |
|      Reorganized Debtors.[1] | ) |
| | ) |
| | ) |
| | )   Case No. 12-cv-02626 (KBF) |
| LEAR CORPORATION, *et al.,* | ) |
| | ) |
|      Appellants, | )   **BRIEF OF APPELLANTS** |
| | ) |
|      v. | ) |
| | ) |
| SUSAN LACAVA, *et al.,* | ) |
| | ) |
|      Appellees. | ) |
| | ) |

---

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each U.S. Reorganized Debtors' federal tax identification number (if any), include:  Lear Corporation (6776); Lear #50 Holdings, LLC (N/A); Lear Argentine Holdings Corporation #2 (7832); Lear Automotive Dearborn, Inc. (4976); Lear Automotive Manufacturing, LLC (3451); Lear Canada (5059); Lear Canada Investments Ltd. (a non-U.S. Reorganized Debtor that does not maintain a U.S. Federal tax identification number); Lear Corporation (Germany) Ltd. (6716); Lear Corporation Canada Ltd. (a non-U.S. Reorganized Debtor that does not maintain a U.S. Federal tax identification number); Lear Corporation EEDS and Interiors (6360); Lear Corporation Global Development, Inc. (3121); Lear EEDS Holdings, LLC (4474); Lear European Operations Corporation (8411); Lear Holdings, LLC (4476); Lear Investments Company, LLC (8771); Lear Mexican Holdings Corporation (7829); Lear Mexican Holdings, LLC (4476); Lear Mexican Seating Corporation (4599); Lear Operations Corporation (5872); Lear Seating Holdings Corp. #50 (9055); Lear South Africa Limited (a non-U.S. Reorganized Debtor that does not maintain a U.S. Federal tax identification number); Lear South American Holdings Corporation (1365); Lear Trim L.P. (8386); and Renosol Seating, LLC (4745). The location of the Reorganized Debtors' corporate headquarters and the service address for all of the Reorganized Debtors is: 21557 Telegraph Road, Southfield, Michigan 48033.

## Table of Contents

I.      **Imposing Damages for Conduct that Pre-Dated the Confirmation Order Would Be Irreconcilable with the Broad Discharge Provided by 11 U.S.C. § 1141 and Congress's Objective of Rehabilitating Corporate Enterprises** ..................10

      A.     Congress Wrote a Broad Discharge Provision and Intended It to Be Interpreted and Enforced as Broadly as Possible ...................................10

      B.     The Applicable Case Law, Like the Bankruptcy Code, Rejects Any and All Efforts to Retroactively Trigger Pre-Confirmation Liability..........................13

II.     **Post-Confirmation "Sales" Cannot Form the Basis of Liability, Even Post-Confirmation Liability, Absent Affirmative Conduct by the Reorganized Debtors that Constitutes a Price Fixing Conspiracy.** ....................................................17

22141369.

## Table of Authorities

### Cases

Abel v. Shugrue (In re Ionosphere Clubs, Inc.),
   184 B.R. 648 (S.D.N.Y. 1995) ................................................................. 5

Carter v. Safety-Kleen Corp.,
   No. 06CV12947, 2007 WL 1180581 (S.D.N.Y. Mar. 14, 2007) ............................................ 15

Corbett v. MacDonald Moving Serv., Inc.,
   124 F.3d 82 (2d Cir. 1997) ................................................................. 18

FCC v. NextWave Personal Comm's, Inc.,
   537 U.S. 293 (2003) ................................................................. 18, 24

Gulf States Exploration Co. v. Manville Prods. Corp. (In re Manville Prods. Corp.),
   896 F.2d 1384 (2d Cir. 1990) ................................................................. 5

Hawaiian Airlines, Inc. v. Mesa Air Group, Inc.,
   355 B.R. 214 (D. Haw. 2006) ................................................................. 24

Holstein v. Brill,
   987 F.2d 1268 (7th Cir. 1993) ................................................................. 11

In re Benjamin Coal Co.,
   978 F.2d 823 (3rd Cir. 1992) ................................................................. 11

In re Best Prods. Co., Inc.,
   140 B.R. 352 (Bankr. S.D.N.Y. 1992) ................................................................. 8

In re Burk Dev. Co., Inc.,
   205 B.R. 778 (Bankr. M.D. La. 1997) ................................................................. 13

In re CD Realty Partners,
   205 B.R. 651 (Bankr. D. Mass. 1997) ................................................................. 24

In re Chateaugay Corp.,
   201 B.R. 48 (Bankr. S.D.N.Y. 1996) ................................................................. 7, 9, 22

In re Chemtura Corp.,
   443 B.R. 601 (Bankr. S.D.N.Y. 2011) ................................................................. 16

In re Chicago, Milwaukee, St. Paul & Pac. Ry. Co.,
   6 F.3d 1184 (7th Cir. 1993) ................................................................. 24

In re Conseco, Inc.,
   330 B.R. 673 (Bankr. N.D. Ill. 2005) ................................................................. 24

In re Enron Corp.,
   419 F.3d 115 (2d Cir. 2005) ................................................................. 8

In re Envirodyne Indus,
   206 B.R. 468 (N.D. Ill. 1997) ................................................................. 17, 22, 24

In re Ionosphere Clubs, Inc.,
   98 B.R. 174 (Bankr. S.D.N.Y. 1989) ................................................................. 12

In re Jensen,
   995 F.2d 925 (9th Cir. 1993) ................................................................. 12

In re Kewanee Boiler Corp.,
   270 B.R. at 917 (Bankr. N.D. Ill. 2002) .................................................. 24

In re Lehman Bros. Holdings Inc.,
   433 B.R. 113 (Bankr. S.D.N.Y. 2010) ...................................................... 8

In re Lower Lake Erie Iron Ore Antitrust Litig.,
   710 F. Supp. 152 (E.D. Pa. 1989) ........................................................... 19

In re Lyondell Chemical Co.,
   442 B.R. 236 (Bankr. S.D.N.Y. 2011) ..................................................... 16

In re Mercado,
   124 B.R. 799 (Bankr. C.D. Cal. 1991) ..................................................... 13

In re Northwest Airlines Corp.,
   2008 WL 630449 (Bankr. S.D.N.Y. Mar. 5, 2008) .................................. 16

In re Penn Cent. Transp. Co.,
   771 F.2d 762 (3d Cir. 1985) .................................................................... 22

In re Revere Cooper & Brass, Inc.,
   172 B.R. 192 (S.D.N.Y. 1994) ......................................................... 17, 20

In re Texaco, Inc.,
   182 B.R. 937 (Bankr. S.D.N.Y. 1995) ............................................. 17, 22

In re Travel Agent Comm'n Antitrust Litig.,
   583 F.3d 896 (6th Cir. 2009) ................................................................... 23

In re UAL Corp.,
   398 B.R. 243 (N.D. Ill. 2008) .................................................................. 14

In re WorldCom, Inc.,
   546 F.3d 211 (2d Cir. 2008) .................................................................... 23

Johnson v. Home State Bank,
   501 U.S. 78 (1991) .................................................................................. 17

Klehr v. A.O. Smith Corp.,
   521 U.S. 179 (1997) ................................................................................ 19

Landgraf v. USI Film Prods.,
   511 U.S. 244, 265 (1994) ........................................................................ 13

McSherry v. Trans World Airlines, Inc.,
   81 F.3d 739 (8th Cir. 1996) ..................................................................... 14

Myers v. United Air Lines, Inc.,
   2009 WL 891751 (S.D. Ohio Mar. 30, 2009) ................................... 16, 22

O'Loghlin v. County of Orange,
   229 F.3d 871 (9th Cir. 2000) ............................................................ 15, 19

Republic Bank & Trust Co. v. Hutchinson,
    444 B.R. 728 (W.D.K.Y. 2011) ................................................................... 24

Schultz v. Shapiro (In re Shapiro),
    59 B.R. 844 (Bankr. E.D.N.Y.1986) ........................................................... 25

Supplee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.),
    No. 04-CV-2413GBD, 2006 WL 510335 (S.D.N.Y. Mar. 2, 2006) ........................................... 4

Trustees of the Amalgamated Ins. Fund v. McFarlin's, Inc.,
    789 F.2d 98 (2d Cir. 1986) ...................................................................... 17

U.S. v. LTV Corp. (In re Chateaugay Corp.),
    944 F.2d 997 (2d Cir. 1991) .......................................................... 11, 13, 16, 18

**Statutes**

11 U.S.C. § 1141 ......................................................................................... passim

11 U.S.C. § 1141(a)(1) ................................................................................. 10

11 U.S.C. § 1141(d)(1) ................................................................................. 13

11 U.S.C. § 1141(d)(1)(A) .......................................................................... 10

11 U.S.C. § 1141(d)(2) ................................................................................. 11

11 U.S.C. § 502 ............................................................................................ 7

11 U.S.C. § 523 .......................................................................................... 11

11 U.S.C. § 727(b) ...................................................................................... 11

28 U.S.C. § 1334 .......................................................................................... 7

28 U.S.C. § 157 ............................................................................................ 7

28 U.S.C. § 157(b) ....................................................................................... 9

28 U.S.C. § 157(b)(2)(I) ............................................................................. 18

**Rules**

Fed. R. Bankr. P. 8013 .................................................................................. 4

22141369.

## INTRODUCTION

The question in this appeal is straightforward:  Does 11 U.S.C. § 1141 mean what it says?  The Bankruptcy Court answered "maybe," and thereby stripped the Reorganized Debtors of well-established protections from lawsuits alleging a decade-long price-fixing conspiracy.  By declining to apply Section 1141 as written, the Bankruptcy Court left standing efforts by the Antitrust Plaintiffs[2] to seek from the Reorganized Debtors (1) damages that were allegedly

---

[2]     The "**Antitrust Actions**" are those claims asserted or assertable against the Reorganized Debtors by plaintiffs (collectively with all similarly situated past, present or future plaintiffs, the "**Antitrust Plaintiffs**") in these cases, as well as any related claims that may be or have been filed in similar actions:  LaCava v. Delphi Auto. LLP, et al., No. 11-14399 (E.D. Mich. Oct. 5, 2011); Bott v. Delphi Auto. LLP, et al., No. 11-4949 (N.D. Cal. Oct. 6, 2011); Nicoud v. Furukawa Elec. Co., et al., No. 11-5057 (N.D. Cal. Oct. 14, 2011); Ballek v. Delphi Auto. LLP, et al., No. 11-14555 (E.D. Mich. Oct. 17, 2011); Junkins v. Delphi Auto. LLP, et al., No. 11-14556 (E.D. Mich. Oct. 17, 2011); Landers Auto Grp No. 1 v. Delphi Auto. LLP, et al., No. 11-00757 (E.D. Ark. Oct. 18, 2011); Hammett Motor Co. v. Delphi Auto. LLP, et al., No. 11-00647 (S.D. Miss. Oct. 18, 2011); Heller v. Delphi Auto. LLP, et al., No. 11-14593 (E.D. Mich. Oct. 19, 2011); Ascher v. Delphi Auto. LLP, et al., No. 11-14605 (E.D. Mich. Oct. 19, 2011); Superstore Auto., Inc. v. Delphi Auto. LLP, et al., No. 11-03092 (D. Minn. Oct. 19, 2011); Kashishian v. Delphi Auto. LLP, et al., No. 11-14639 (E.D. Mich. Oct. 21, 2011); Martens Cars of Wash. Inc. v. Delphi Auto. LLP, et al., No. 11-01892 (D.D.C. Oct. 27, 2011); Shah v. Delphi Auto. LLP, et al., No. 11-14739 (E.D. Mich. Oct. 27, 2011); Kelly v. Delphi Auto. LLP, et al., No. 11-5301 (N.D. Cal. Oct. 31, 2011); McInnis v. Delphi Auto. LLP, et al., No. 11-14811 (E.D. Mich. Nov. 1, 2011); Brownson v. Furukawa Elec. Co. et al., No. 11-14831 (E.D. Mich. Nov. 2, 2011); Herr v. Furukawa Elec. Co. et al., No. 11-14836 (E.D. Mich. Nov. 2, 2011); Tracy v. Delphi Auto. LLP, et al., Case No. 11-14838 (E.D. Mich. Nov. 2, 2011); Budner v. Delphi Auto. LLP, et al., No. 11-5477 (N.D. Cal. Nov. 10, 2011); Adams v. Furukawa Elec. Co. et al., No. 11-14989 (E.D. Mich. Nov. 11, 2011); Chase v. Delphi Auto. LLP, et al., No. 11-15041 (E.D. Mich. Nov. 14, 2011); Martinez Mfgr. Inc. v. Furkawa Elec. Co., No. 11-15186 (E.D. Mich. Nov. 23, 2011); Gordon v. Delphi Auto. LLP, et al., No. 11-05773 (N.D. Cal. Dec. 1, 2011); Crespo v. Delphi Auto. LLP, et al., No. 11-2176 (D.P.R. Dec. 7, 2011); Sirmon v. Delphi Auto. LLP, et al., No. 11-00696 (S.D. Ala. Dec. 8, 2011); Technical Aids to Independence, Inc. v. Delphi Auto. LLP, et al., No. 11-15428 (E.D. Mich. Dec. 9, 2011); Beck v. Delphi Auto. LLP, et al., No. 11-15445 (E.D. Mich. Dec. 12, 2011); Brandstein v. Delphi Auto. LLP, et al., No. 11-15468 (E.D. Mich. Dec. 14, 2011; Muscara v. Delphi Auto. LLP, et al., Case No. 11-03177 (N.D. La. Dec. 29, 2011); Brock v. Delphi Auto. LLP, et al., No. 12-00003 (E.D. La. Jan. 3, 2012); Keifer v. Delphi Auto. LLP, et al., No. 12-00048 (E.D. La. Jan. 6, 2012); Byrne v. Delphi Auto. LLP, et al., No. 12-00062 (E.D. La. Jan. 10, 2012);Timberline Mfg. Co. v. Delphi Auto. Sys., et al., No. 12-10153 (E.D. Mich. Jan. 12, 2012); Cesar-Scott, Inc. v. Delphi Auto. Sys., et al., No. 12-10177 (E.D. Mich. Jan. 13, 2012); Maravilla v. Delphi Auto. LLP, et al., No. 12-00258 (N.D. Cal. Jan. 17, 2012); Paesano Connecting Sys. v. Delphi Auto. Sys., No. 12-10201 (E.D. Mich. Jan. 17, 2012); Nickell v. Delphi Auto. LLP, et al., No. 12-00079 (S.D. W. Va. Jan. 18, 2012); Josefsberg v. Delphi Auto. LLP, et al., No. 12-00171 (E.D. La. Jan. 20, 2012); RD Auto., Inc. v. Delphi Auto. LLP, et al., No. 12-10262 (E.D. Mich. Jan. 20, 2012); Sherman v. Delphi Auto. LLP, et al., No. 12-10260 (E.D. Mich. Jan. 20, 2012); Barron v. Delphi Auto. LLP, et al., No. 12-00839 (N.D. Cal. Feb. 21, 2012); Nguyen v. Am. Furukawa, Inc., No. 12-10951 (E.D. Mich. Mar. 1, 2012); Olson v. Delphi Auto. LLP, et al., No. 12-10929 (E.D. Mich. Mar. 1, 2012); Wick v. Delphi Auto. LLP, et al., No. 12-10966 (E.D. Mich. Mar. 2, 2012); Vanhoutte v. Yazaki Corp. et al., No. 12-11054 (E.D. Mich. Mar. 8, 2012); South Star Corp. v. Delphi Auto Sys., et al., No. 12-11165 (E.D. Mich. Mar. 15, 2012); Prince v. Delphi Auto. LLP, et al., No. 12-11271 (E.D. Mich. Mar. 21, 2012); Lamson v. Delphi Auto. LLP, et al., No. 12-1511 (N.D. Cal. Mar. 26, 2012).

incurred prior to confirmation of the Reorganized Debtors' confirmed chapter 11 plan of reorganization and (2) damages that were allegedly incurred post-confirmation but that are based on sales made pursuant to contracts awarded pre-confirmation.  Instead of enforcing the confirmation order that it (pursuant to Section 1141) entered and barring such claims, the Bankruptcy Court deferred these issues to the judge handling a multi-district litigation before the United States District Court for the Eastern District of Michigan (the "**MDL Court**"), allowing them to be swept up with every other claim brought in the MDL Court against other defendants, some of whom—unlike the Reorganized Debtors—have been prosecuted by the Antitrust Division of the U.S. Department of Justice and pled guilty to related conduct.

Respectfully, the Bankruptcy Court's rationale in general, and its deference to the MDL Court on core, fundamental bankruptcy questions in particular, were incorrect as a matter of law. Even if the Antitrust Plaintiffs' overly aggressive interpretation of antitrust conspiracy law was well-founded—and it is not—there simply is no antitrust exception to the bankruptcy discharge. Indeed, Congress created a number of exceptions to discharge, in a variety of contexts, but the Antitrust Plaintiffs fall into none of them.  Under well-settled law, any liability for conduct or damages pre-dating plan confirmation is discharged by the confirmed chapter 11 plan and 11 U.S.C. § 1141.  It is similarly settled that, to have post-confirmation liability, the Antitrust Plaintiffs: (1) would need to plead and prove all of the elements of a price-fixing conspiracy based on conduct that occurred *after* confirmation; and (2) could only recover damages for sales made post-confirmation.  The Bankruptcy Court erred by opening the door to other possibilities.

The Reorganized Debtors seek two rulings from the Court in this appeal.

First, the Reorganized Debtors seek reversal of the Bankruptcy Court's ruling that the Antitrust Plaintiffs may seek damages from the Reorganized Debtors, under theories of joint and

several liability, continuing conspiracy or otherwise, caused by activity that occurred prior to confirmation of the Plan.

Second, the Reorganized Debtors seek reversal of the Bankruptcy Court's holding that a mere sale of product by the Reorganized Debtors after confirmation might serve as a basis of liability—without the Antitrust Plaintiffs demonstrating that every other element of a conspiracy claim existed after plan confirmation—as long as the Antitrust Plaintiffs are able to show that the elements of such a conspiracy existed ***prior*** to confirmation.

Allowing the first ruling to stand would upset the statutory scheme facilitating corporate reorganization by depriving the Reorganized Debtors of the fresh start guaranteed by chapter 11. The ruling would fundamentally undermine the protections Congress granted not only for those who relied on a broad discharge in these chapter 11 cases, but also for all stakeholders in past and future chapter 11 cases.  Indeed, if the Bankruptcy Court's opinion stands, former debtors in cases long brought to conclusion may rightly question the finality of their chapter 11 discharge.

Allowing the second ruling to stand would further upset the reorganization apple cart. Under the Bankruptcy Court's rationale, the Reorganized Debtors could conceivably face liability merely for continuing their businesses post-confirmation in the ordinary course.

Neither of these rulings is consistent with the Bankruptcy Code or applicable case law. Both issues are at the heart of bankruptcy jurisprudence and address critical bankruptcy questions fundamental to the scope and purpose of the chapter 11 discharge—these are bankruptcy, not antitrust, questions.  The Reorganized Debtors submit that the Bankruptcy Court erred in deferring to a non-bankruptcy forum as to the scope of the chapter 11 discharge and ask that this Court reverse the Bankruptcy Court to the extent set forth herein.

## JURISDICTION

Pursuant to 28 U.S.C. § 158(a)(1), the United States District Court for the Southern District of New York has jurisdiction to hear appeals from final judgments, orders, and decrees of Bankruptcy Courts in this District.

## STATEMENT OF ISSUES ON APPEAL

1. Did the Bankruptcy Court err in finding that the question of whether the Antitrust Actions are discharged as a result of the confirmation of the *Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 633] (the "**Plan**")—notwithstanding its "core" bankruptcy status under 28 U.S.C. § 157(b)(2) and the plain language of 11 U.S.C. § 1141—might be a question of antitrust rather than bankruptcy law?

2. Did the Bankruptcy Court err in ruling that, despite the text of 11 U.S.C. § 1141 and the Bankruptcy Code's "fresh start" policy, a district court might be able to assess damages against a reorganized debtor that arose prior to confirmation of its plan of reorganization as a result of conduct that allegedly took place after confirmation?

3. Did the Bankruptcy Court err in failing to bar the Antitrust Plaintiffs from using post-confirmation "sales" of Wire Harness Systems as a basis of liability without also demonstrating that the Reorganized Debtors engaged in the other requisite affirmative conduct post-confirmation that would constitute a price fixing conspiracy?

4. Did the Bankruptcy Court otherwise err in partially denying the relief sought by the Reorganized Debtors?

## STANDARD OF REVIEW

"A district court reviews a bankruptcy court's conclusions of law *de novo*. Findings of fact are reviewed under the clearly erroneous standard and, therefore, may not be disturbed unless clearly erroneous." Supplee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.), No. 04-CV-2413GBD, 2006 WL 510335, at *1 (S.D.N.Y. Mar. 2, 2006) (citing Fed. R. Bankr. P. 8013; Gulf States Exploration Co. v. Manville Prods. Corp. (In re Manville Prods. Corp.), 896 F.2d 1384, 1388 (2d Cir. 1990); Abel v. Shugrue (In re Ionosphere Clubs, Inc.), 184 B.R. 648 (S.D.N.Y. 1995)).

4

## STATEMENT OF THE CASE AND THE FACTS

The Reorganized Debtors are leading global suppliers of automotive seat systems and electrical power management systems. The Reorganized Debtors maintain their global headquarters in Southfield, Michigan, and employ nearly 98,000 workers worldwide, including approximately 7,400 employees in the United States and Canada, as of December 2011.[3]

One of the Reorganized Debtors' businesses is the manufacture of wire harness systems ("**Wire Harness Systems**"), which are part of the electrical distribution systems used to control electronic components, wiring, and circuit boards.[4] Wire Harness Systems are typically sold to original equipment manufacturers ("**OEMs**"). The Reorganized Debtors sell significantly fewer Wire Harness Systems in the marketplace than their largest competitors.[5]

On July 7, 2009 (the "**Petition Date**"), the Reorganized Debtors commenced the chapter 11 cases (the "**Chapter 11 Cases**"). The Reorganized Debtors filed the cases after negotiating and developing a comprehensive restructuring plan, including an evaluation of their liabilities to constituents. The plan enjoyed the support of overwhelming majorities of the Reorganized Debtors' principal constituents holding billions of dollars in prepetition claims, each of whom made substantial concessions to come to an agreed-upon deal.[6]

---

[3]   See Form 10-K Lear Corporation for the Fiscal Year Ended December 31, 2011, at 9-12.

[4]   See *Declaration of Shari L. Burgess of Lear Corporation (I) in Support of Debtors' Chapter 11 Petitions and First Day Motions and (II) Pursuant to Local Bankruptcy Rule 1007-2* [Docket No. 32].

[5]   See *Declaration of Bernard Persky in Support of Plaintiffs' Joint Response in Opposition to Debtors' Motion for Entry of an Order (A) Enforcing Chapter 11 Plan Discharge and Injunction and (B) Directing Dismissal of Pending Litigation* [Docket No. 1666] at 347 (Antitrust Plaintiffs' chart alleging Lear market share of approximately 7.95%, as compared to competitors holding market shares of nearly 30%).

[6]   See *Certification of Alison M. Tearnen Pursuant to Local Bankruptcy Rule 3018-1(A) with Respect to the Tabulation of Votes on the Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 994]; see also *Notice of Filing the Lender Plan Support Agreement and the Noteholder Plan Support Agreement* [Docket No. 31].

During the course of the Chapter 11 Cases, the Reorganized Debtors filed a series of motions and obtained corresponding orders establishing procedures, including deadlines, for filing proofs of claim and for solicitation of votes on and objections to the Plan.[7]   The Reorganized Debtors provided broad notice of each of these motions—providing actual notice to all known creditors as well as publication notice where appropriate—and the Bankruptcy Court issued orders approving them after all parties in interest were given an opportunity to be heard.[8]

On September 18, 2009, the Reorganized Debtors filed the Plan, which provided for, among other things, a customary injunction pursuant to 11 U.S.C. § 1141.  See Plan Art. IX.[9]

---

[7]   See *Debtors' Motion for Entry of an Order (A) Setting Bar Dates for Filing Proofs of Claim (B) Approving the Form and Manner for Filing Proofs of Claim and (C) Approving Notice Thereof* [Docket No. 247]; *Notice of Presentment of Debtors' Motion for Entry of an Order Setting Bar Date for Filing Administrative Claims* [Docket No. 1111];  *Notice of Debtors' Motion for Entry of an Order: (A) Approving the Disclosure Statement; (B) Approving Certain Dates Related to Confirmation of the Plan; (C) Approving Certain Voting Procedures and the Form of Certain Documents to be Distributed in Connection with Solicitation of the Plan; and (D) Approving Proposed Voting and General Tabulation Procedures* [Docket No. 366]

[8]   See, e.g., *Order (A) Setting Bar Dates for Filing Proofs of Claim (B) Approving the Form and Manner for Filing Proofs of Claim and (C) Approving Notice Thereof* [Docket No. 449] (the "**General Bar Date Order**," and, collectively with the Administrative Claims Bar Date Order, the "**Bar Date Orders**") (establishing October 2, 2009  as the general claims bar date for filing proofs of claim in the Chapter 11 Cases, (the "**General Bar Date**")); Administrative Claims Bar Date Order (establishing January 15, 2010 as the bar date for filing proofs of "administrative" claims (i.e., those arising subsequent to the July 7, 2009 Petition Date but prior to the November 9, 2009 Effective Date) (the "**Administrative Claims Bar Date**," and, collectively with the General Bar Date, the "**Bar Dates**")); see also *Affidavit of Service* [Docket No. 543] (evidencing service of the notice of the general bar date); *Affidavit of Service* [Docket No. 1270] (evidencing service of the notice of the administrative claims bar date); *Affidavits of Publication* [Docket Nos. 554, 555, 556] (evidencing notice of publication of the general bar date in the *The Wall Street Journal, The Globe and Mail (National Edition)* and *The Detroit Free Press*); *Affidavits of Publication* [Docket Nos. 1312, 1313] (evidencing notice of publication of the administrative claims bar date in the *The Wall Street Journal* and *The Globe and Mail*).

Both Bar Date Orders contain a finding that the approved form and manner of notice "constitutes adequate and sufficient notice and satisfies the requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules."  See General Bar Date Order ¶ 18; Administrative Claims Bar Date Order ¶ 13.

[9]   See Plan, Art. IX.A (discharging discharges "all Claims, Interests, and Causes of Action of any nature whatsoever . . . whether or not . . . a Proof of Claim based upon such Claim, debt, right, or Interest is Filed [and whether or not] a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section § 502 of the Bankruptcy Code."); Plan, Art. IX.H (enjoining "[a]ll Entities who have held, hold or may hold Claims, Equity Interests, Causes of Action or liabilities that . . . have been discharged pursuant to Article IX.A hereof . . . from . . . commencing or continuing in any matter any action or other proceeding of any kind against any Entity so . . . discharged . . .  on account of or in connection with or with respect to any such . . . discharged . . . Claims, Equity Interests, causes of action or liabilities.").

The Plan was overwhelmingly accepted by each class of creditors entitled to vote.[10]   On November 5, 2009, the Bankruptcy Court entered the Confirmation Order, and the Plan became effective on November 9, 2009 (the "**Effective Date**").[11]   Under Article XI of the Plan, the Bankruptcy Court retained jurisdiction to, among other things, (a) enforce the injunctions contained, pursuant to 11 U.S.C. § 1141, in the Plan and the Confirmation Order and (b) determine the status of any claims maintained against the Reorganized Debtors.[12]

Beginning on October 5, 2011, the Antitrust Plaintiffs commenced putative class actions against a number of Wire Harness System manufacturers, including the Reorganized Debtors. The complaints allege that the Reorganized Debtors and others conspired, beginning in January 2000, to fix the prices of Wire Harness Systems in violation of state and federal antitrust law. The Antitrust Plaintiffs seek to recover damages purportedly arising and continuing from January 2000—nearly ten years prior to the Confirmation Order, as well as injunctive relief.  None of the Antitrust Plaintiffs filed a proof of claim in the Chapter 11 Cases.

On November 17, 2011, the Debtors filed a *Motion for Entry of an Order (a) Enforcing Chapter 11 Plan Discharge and Injunction and (B) Directing Dismissal of Pending Litigation* [Docket No. 1660] (the "**Discharge and Injunction Motion**"), asking the Bankruptcy Court to enforce the discharge and injunction in the Confirmation Order and Section 1141 to bar the Antitrust Actions in their entirety.   In response, the Antitrust Plaintiffs asserted that the Reorganized Debtors should be held jointly and severally liable for damages caused during the

---

[10]   See *Certification of Alison M. Tearnen Pursuant to Local Bankruptcy Rule 3018-1(a) with Respect to the Tabulation of Votes on the Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 994].

[11]   See *Notice of (I) Entry of Order Confirming Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, (II) Occurrence of Effective Date and (III) Deadlines for Filing Certain Claims and Requests for Payment* [Docket No. 1081].

[12]   See 28 U.S.C. §§ 157, 1334; In re Chateaugay Corp., 201 B.R. 48, 64–65 (Bankr. S.D.N.Y. 1996).

entire alleged conspiracy—even for those portions of the conspiracy occurring prior to confirmation of the Plan.[13]

In its Order and Memorandum Opinion, the Bankruptcy Court correctly held that, as a result of its entry of the Bar Date Orders, occurrence of the Bar Dates, and confirmation and effectiveness of the Plan, all "claims" held by the Antitrust Plaintiffs existing against the Reorganized Debtors as of November 9, 2009, are discharged and enjoined.[14]   However, the Bankruptcy Court deferred to the MDL Court the question whether the Antitrust Plaintiffs might seek to hold the Reorganized Debtors liable for damages incurred before—potentially a decade before—confirmation of the Reorganized Debtors' chapter 11 Plan.  The Bankruptcy Court also left for the MDL Court to decide whether the Antitrust Plaintiffs may seek damages based only on the Reorganized Debtors' post-confirmation sales under contracts entered into prior to confirmation.

The Bankruptcy Court's ruling has the potential effect of (1) imposing liability for pre-confirmation damages upon the Reorganized Debtors and (2) punishing the Reorganized Debtors for carrying on their post-confirmation business in the ordinary course—by merely selling products under contracts entered into prior to confirmation.  If upheld, this ruling would turn the core purpose of bankruptcy on its head by nullifying the benefits of the chapter 11 fresh start.  Accordingly, for the reasons described below, the Reorganized Debtors respectfully request that the Court reverse the Bankruptcy Court's ruling in part.

---

[13]   *See Plaintiffs' Joint Response in Opposition to Debtor's Motion for Entry of an Order A) Enforcing Chapter 11 Plan of Discharge and Injunction and B) Directing Dismissal of Pending Litigation* [Docket No. 1665] ("**Antitrust Plaintiffs' Objection**") at 2–3.

[14]   See Order ¶¶ 3 & 4; Confirmation Order ¶ 78; see also In re Lehman Bros. Holdings Inc., 433 B.R. 113, 119–20, 127 (Bankr. S.D.N.Y. 2010) ("the Bar Date Order needs to be uniformly enforced except in truly unusual and compelling circumstances.") (citing In re Enron Corp., 419 F.3d 115, 123 (2d Cir. 2005)); In re Best Prods. Co., Inc., 140 B.R. 352, 359–60 (Bankr. S.D.N.Y. 1992) (discharging claim where "unknown" claimants filed suit after debtor's bar date, based on injuries suffered prior to the petition date).

## ARGUMENT

The Bankruptcy Court had "core" jurisdiction over the scope and extent of the Reorganized Debtors' chapter 11 discharge.   See 28 U.S.C. § 157(b) (defining as core proceedings, among other things, allowance or disallowance of claims and proceedings to determine the dischargeability of debts); see also Plan, Art. IX.H; In re Chateaugay Corp., 201 B.R. 48, 64–65 (Bankr. S.D.N.Y. 1996) (bankruptcy court jurisdiction continues post-confirmation and is particularly appropriate where the plan and confirmation order specifically preserve the court's jurisdiction).   But instead of deciding the bankruptcy discharge issues squarely raised by the Discharge and Injunction Motion, the Bankruptcy Court deferred the issues to the MDL Court, recharacterizing core bankruptcy matters as issues of antitrust law.   See Memorandum Opinion at 18-19 ("The nature and extent of Lear's conduct after the Effective Date of the Plan in violation of the antitrust laws, if any, and its effect are issues that can and should be decided by the antitrust court in connection with the prosecution of a consolidated amended complaint.").   This was error.

As described in detail below, the Discharge and Injunction Motion raised core issues of bankruptcy law and policy that were clearly expressed by Congress in the text of the discharge statute and in the overall structure of the Bankruptcy Code.   The Bankruptcy Court's opinion could have the effect of imposing pre-confirmation liability on the Reorganized Debtors merely for continuing to operate their business in the ordinary course after confirmation.   This cannot stand.   Interpreting the scope of the bankruptcy discharge outside of the bankruptcy law context upsets the careful balance struck by the Reorganized Debtors and their constituents and, for both chapter 11 cases going forward and those believed to be closed long ago, undermines the certainty afforded to companies and stakeholders by the chapter 11 discharge.

I.      **Imposing Damages for Conduct that Pre-Dated the Confirmation Order Would Be Irreconcilable with the Broad Discharge Provided by 11 U.S.C. § 1141 and Congress's Objective of Rehabilitating Corporate Enterprises.**

   A.      **Congress Wrote a Broad Discharge Provision and Intended It to Be Interpreted and Enforced as Broadly as Possible**

   11 U.S.C. § 1141(a)(1) provides that:

   Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, *the confirmation of a plan*—

   (A) *discharges the debtor from any debt that arose before the date of such confirmation,* and any debt of a kind specified in section 502(g), 502(h), or 502(i) of this title, whether or not—

      (i) a proof of the claim based on such debt is filed or deemed filed under section 501 of this title;

      (ii) such claim is allowed under section 502 of this title; or

      (iii) the holder of such claim has accepted the plan; and

   (B) terminates all rights and interests of equity security holders and general partners provided for by the plan.

11 U.S.C. § 1141(a)(1) (emphasis added).  This statutory language is unambiguous:  all claims against a debtor relating to conduct occurring before confirmation are discharged unless otherwise provided in the plan of reorganization or elsewhere in Section 1141(a)(1).  <u>See</u>, <u>e.g.</u>, <u>Holstein v. Brill</u>, 987 F.2d 1268, 1269 (7th Cir. 1993) ("Confirmation automatically discharges all debts other than those provided for in the plan, 11 U.S.C. § 1141(d)(1)(A), and 'each claimant gets a 'new' claim, based upon whatever treatment is accorded to it in the plan itself.'") (<u>quoting</u> <u>In re Benjamin Coal Co.</u>, 978 F.2d 823, 826 (3rd Cir. 1992) ("discharge of all existing claims . . . upon confirmation of a Chapter 11 plan is unambiguous . . . in the Bankruptcy Code."); COLLIER ON BANKRUPTCY (15th ed.) § 1141.01 ("section 1141(d) provides generally for the discharge of debts that arose before plan confirmation").

Congress deliberately intended the chapter 11 discharge to be broad.  And for good reason:  Section 1141 is perhaps the most important provision of the Bankruptcy Code precisely because its discharge makes possible the rehabilitation of corporate debtors.  <u>See</u> <u>In re Chateaugay Corp.</u>, 944 F.2d 997, 1002 (2d Cir. 1991) (allowing pre-discharge damages would contradict Congress' intent to provide chapter 11 debtors a fresh start by maximizing the scope of the discharge).  Indeed, the "paramount policy and goal of Chapter 11, to which all other bankruptcy policies are subordinated, is the rehabilitation of the debtor." <u>In re Ionosphere Clubs, Inc.</u>, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); <u>see also</u> <u>In re Jensen</u>, 995 F.2d 925, 931 (9th Cir. 1993) (noting the discharge and broad definition of "claim" ensure that "all legal obligations of the debtor, no matter how remote or contingent" are dealt with in the bankruptcy case).

Congress could have chosen differently.  Indeed, in other circumstances it did precisely that by creating clear exceptions to the bankruptcy discharge in certain limited scenarios. Section 523 of the Bankruptcy Code, for example, specifically defines 19 types of claims that cannot be discharged in a chapter 7 liquidation.  <u>See</u> 11 U.S.C. §§ 523, 727(b).  Alleged joint and several liability for damages flowing from a pre-confirmation antitrust conspiracy was not one of them.  And in the chapter 11 context, Congress created exceptions to the statutory discharge only for individual debtors, not for corporate debtors.  <u>See</u> 11 U.S.C. § 1141(d)(2).  Congress's intent could not be clearer:  the discharge of all claims and liabilities against corporate debtors existing at the time of plan confirmation is absolute, precisely because such clarity is necessary for the bankruptcy process to work; any alternative would "impose[] unwarranted limitations on debtors seeking to reorganize under Chapter 11."  <u>In re Mercado</u>, 124 B.R. 799, 802–03 (Bankr. C.D. Cal. 1991); <u>see also</u> <u>Chateaugay</u>, 944 F.2d at 1002.

11

As applied to this particular reorganization, Congress's choice is particularly important. Many of the Reorganized Debtors' constituencies made significant sacrifices—they agreed to trade their claims for stock in the Reorganized Debtors based on the fundamental premise that the reorganized company would get a "fresh start" and could not be charged with any liability relating to the pre-confirmation period.[15]  Those stakeholders likely would have acted differently if faced with the risk that a court could unsettle their expectations and the rights afforded by the Bankruptcy Code by opening the door to a potentially massive pre-confirmation liability.  See In re Burk Dev. Co., Inc., 205 B.R. 778 (Bankr. M.D. La. 1997) (retroactively requiring the debtors to pay post-confirmation fees "would clearly impair the rights of the parties as cemented in the confirmed [p]lan" and contravene "the principle that 'settled expectations should not be lightly disrupted'" (quoting Landgraf v. USI Film Prods., 511 U.S. 244, 265 (1994))).

Congress did not create, and no court should invent, an exception to discharge for alleged joint and several liability under antitrust law.  The Bankruptcy Court's Order, by allowing for the possibility of pre-confirmation damages flowing from the Antitrust Plaintiffs' interpretation of joint and several liability, disregards clear statutory language and even clearer Congressional intent.  If this sort of potential liability survives confirmation of a chapter 11 plan, the stability and certainty that underlies every plan is gone—including chapter 11 cases long ago believed to be otherwise closed.  Here, respectfully, it was the Bankruptcy Court's responsibility to protect the Plan and Confirmation Order and all of the constituencies who traded hundreds of millions of dollars in claims for stock in reliance on finality by barring the Antitrust Actions and eliminating any possibility of pre-confirmation damages.

---

[15]   See Plan, Art. IX.A (granting discharge); Plan, Art. IX.H (enjoining claims).  Constituents agreed throughout the Chapter 11 Cases to support the Reorganized Debtors and became shareholders under the Plan based on the expectation—in reliance on Section 1141, the Plan, and precedent—that the Reorganized Debtors would benefit from a broad statutory discharge.  See Notice of Filing of Plan Support Agreements [Docket No. 31].

**B.      The Applicable Case Law, Like the Bankruptcy Code, Rejects Any and All Efforts to Retroactively Trigger Pre-Confirmation Liability.**

A discharge is a discharge; once the Plan was confirmed, any and all liability existing as of that day was either treated in the Plan or discharged.  See 11 U.S.C. § 1141.  Discharge is complete and absolute, regardless of the Reorganized Debtors' conduct after confirmation.

Common fact patterns in three other areas of the law illustrate this point.  In employment cases, for example, employees often sue a reorganized debtor post-confirmation for discrimination that allegedly occurred prior to confirmation.  The law in this context is settled: Section 1141 discharges all such claims.  See, e.g., McSherry v. Trans World Airlines, Inc., 81 F.3d 739, 740 (8th Cir. 1996) ("[C]onfirmation of a debtor's bankruptcy plan discharges debts arising prior to the date of the confirmation."); In re UAL Corp., 398 B.R. 243, 247 (N.D. Ill. 2008) ("once United's Plan was confirmed, under the plain language of 11 U.S.C. § 1141(d)(1) and case law on point, United was discharged from all claims based on conduct occurring prior to confirmation"); Carter v. Safety-Kleen Corp., No. 06CV12947, 2007 WL 1180581, at *4 (S.D.N.Y. Mar. 14, 2007) (courts' "collective-and unanimous-reasoning" is that discrimination claims based on conduct that began prior to confirmation are barred by discharge).

Some plaintiffs in the employment context have gone further, claiming that the alleged discrimination took place over a long period of time, both before *and* after confirmation of a plan of reorganization.  The answer in those cases is similarly straightforward.  Plaintiffs may sue post-confirmation in this scenario if and only if they can independently establish a cause of action based on post-confirmation conduct.  And if a plaintiff can satisfy this high hurdle, the damages for such a violation are calculated beginning as of the confirmation date.  See O'Loghlin v. County of Orange, 229 F.3d 871, 874 (9th Cir. 2000).  The rationale for this result

is simple.  Regardless of whether illegal conduct "continues" after confirmation, any and all pre-confirmation damages based on such conduct had already been discharged by confirmation:

> First, if the [post-confirmation] violation was sufficiently independent of the pre-discharge violations that it did not constitute part of a continuing violation of the ADA, O'Loghlin may recover damages beginning from the date of the violation. Second, if the violation was so related to the pre-discharge violations that the pre- and post-discharge conduct constitutes a continuing violation, O'Loghlin may recover damages *from the date of discharge*.  Under the second scenario, the actionable part of the violation begins at the moment of discharge, not at the time of the later overt violation, for the violation is continuous over the entire pre- and post-discharge period . . . *no damages may be rewarded for that earlier [pre-discharge] period*.

*Id.* at 876 (emphasis added); see also In re Northwest Airlines Corp., 2008 WL 630449 (Bankr. S.D.N.Y. Mar. 5, 2008) (because all "liability for pre-confirmation discriminatory actions is discharged," "plaintiff could not recover for any discrimination that took place before the County's discharge"); Myers v. United Air Lines, Inc., 2009 WL 891751 (S.D. Ohio Mar. 30, 2009) (because "any claims for actions that took place before the confirmation . . . were discharged," all pre-confirmation damages were irrelevant).

Environmental liabilities are treated similarly.  These liabilities are typically joint and several, and may be identified long after alleged damages actually accrue.  Yet courts have uniformly disallowed claims filed post-confirmation by claimants asserting a debtor's alleged joint and several liability.  See, e.g., In re Lyondell Chemical Co., 442 B.R. 236 (Bankr. S.D.N.Y. 2011); In re Chemtura Corp., 443 B.R. 601 (Bankr. S.D.N.Y. 2011).  The result where bankruptcy and environmental law intersect is similar—the bankruptcy discharge controls: confirmation wipes the slate clean for a reorganized debtor and eliminates any ability to charge a debtor for conduct that preceded confirmation.  See, e.g., Chateaugay, 944 F.2d at 1002 ("we encounter a bankruptcy statute that is intended to override many provisions of law that would apply in the absence of bankruptcy—especially laws otherwise providing creditors suing

14

promptly with full payment of their claims"); In re Texaco, Inc., 182 B.R. 937, 951-52 (Bankr. S.D.N.Y. 1995) ("The Chateaugay Court was faced with the issue of whether unincurred CERCLA response costs for pre-petition releases are 'claims.' The Court found that these costs are indeed claims, dischargeable in bankruptcy, regardless of when such costs were incurred, as long as such costs concerned pre-petition release or threatened release of hazardous waste."); see also In re Envirodyne Indus., 206 B.R. 468, 472 (N.D. Ill. 1997) (holding that the environmental claims discharged in Chateaugay are "not dissimilar in many characteristics to an antitrust claim" and thus antitrust claims based on pre-confirmation conduct are discharged).[16]

Third, in the pension liability context, although liability for withdrawal from a multi-employer pension plan is "joint and several," bankruptcy courts uniformly apportion liability between amounts incurred prepetition (general unsecured claim status) and amounts incurred postpetition (administrative claim status).   See Trustees of the Amalgamated Ins. Fund v. McFarlin's, Inc., 789 F.2d 98 (2d Cir. 1986) (withdrawal liability that relates back to a prepetition obligation is a general unsecured claim).   And the Second Circuit has held that even where only *part* of a joint and several withdrawal liability claim had accrued at the time of reorganization, and where the debtor could be held liable for claims against others, the claim is discharged by Section 1141.   See Corbett v. MacDonald Moving Serv., Inc., 124 F.3d 82, 90-02 (2d Cir. 1997) (withdrawal liability claim was discharged even though it could not have been brought in full, or perhaps could not have been brought at all, prior to confirmation).

---

[16]   Equally important here is the well-settled principle that whether a particular environmental liability survives confirmation of a plan of reorganization "is a matter of bankruptcy law" typically decided as a matter of course by the bankruptcy court that confirmed the plan.  See, e.g., In re Revere Cooper & Brass, Inc., 172 B.R. 192, 197 (S.D.N.Y. 1994) (citing Johnson v. Home State Bank, 501 U.S. 78, 81-83 (1991) (whether a dischargeable claim is at issue is "to be resolved by reference to the text, history, and purpose of the Bankruptcy Code")).

These specific examples are not anomalies—they reflect the rule, not any exceptions.  It is well-settled that the discharge provided under bankruptcy law controls over state and federal law that might otherwise create and maintain claims against a reorganized company.  Indeed, it must, as Congress has determined that a complete "fresh start" for corporate debtors is necessary to promote the ultimate goal of facilitating corporate reorganizations.  Chateaugay, 944 F.2d at 1002 (Section 1141 is a "bankruptcy statute that is intended to override many provisions of law that would apply in the absence of bankruptcy—especially laws otherwise providing creditors suing promptly with full payment of their claims"); see FCC v. NextWave Personal Comm's, Inc., 537 U.S. 293, 303 (2003) (discharge applies to all claims, even regulatory ones); COLLIER ON BANKRUPTCY § 1141.05[b] ("A corporation's discharge in a chapter 11 case is generally pervasive. All debts, no matter how incurred, are discharged upon confirmation. . .. ").

Here, the Antitrust Plaintiffs theorize that the Reorganized Debtors can be held liable for pre-confirmation damages based upon post-confirmation conduct that allegedly is in furtherance of a conspiracy they entered into pre-confirmation.  See Antitrust Plaintiffs' Objection at 12-16.  This theory is incorrect and fundamentally inconsistent with bankruptcy law and policy.  Under bankruptcy law, the confirmation date is the ***earliest*** date from which damages can be measured.  O'Loghlin, 229 F.3d at 874

Moreover, read properly, neither of the cases cited by the Antitrust Plaintiffs and mentioned in the Bankruptcy Court's Memorandum Opinion, Klehr v. A.O. Smith Corp., 521 U.S. 179 (1997) and In re Lower Lake Erie Iron Ore Antitrust Litig., 710 F. Supp. 152 (E.D. Pa. 1989), support the possibility of pre-confirmation damages under the current set of facts:

- ***First***, neither is a bankruptcy case and neither has any relevance to the question of whether bankruptcy law permits the imposition of pre-confirmation damages against a reorganized debtor.

- ***Second***, the first case, <u>Klehr</u>, does not even support the holding that the Antitrust Plaintiffs ascribe to it. <u>Klehr</u> held that "commission of a separate new overt act generally does not permit the plaintiff to recover for injury caused by old overt acts outside the limitations period." 521 U.S. at 179. Here, the confirmation date serves the same function as the expiration of the limitations period in <u>Klehr</u>. Antitrust Plaintiffs cannot recover for events occurring prior to that date.

- ***Finally***, in the second case, <u>Lower Lake Erie</u>, the defendant successor railroad had never been the beneficiary of a statutorily-prescribed and court-ordered discharge (whether under chapter 11 or any other insolvency statute). <u>Lower Lake Erie</u> is a successor liability case, not a bankruptcy case, and is irrelevant to the discharge question at issue here.

In other words, there is no authority for "re-triggering" damages exposure discharged by 11 U.S.C. § 1141 based on a debtor's post-confirmation conduct. Here, in the deal consummated through the Plan and Confirmation Order, thousands of creditors agreed to trade billions of dollars in claims for stock in the Reorganized Debtors under the premise that the entity in which they obtained their stock would have a "fresh start" free of any existing liability. By failing to protect the Plan and Confirmation Order or the thousands of creditors that relied on it, the Bankruptcy Court erred, and reversal is necessary to restore the sanctity and finality of the bankruptcy process that Congress intended.

## II.   Post-Confirmation "Sales" Cannot Form the Basis of Liability, Even Post-Confirmation Liability, Absent Affirmative Conduct by the Reorganized Debtors that Constitutes a Price Fixing Conspiracy.

The Bankruptcy Court's opinion improperly defers to the MDL Court on a further critical issue of bankruptcy law—the level of post-confirmation conduct by the Reorganized Debtors necessary to establish a non-discharged claim at all. <u>See</u> Memorandum Opinion at 18-19. Whether particular conduct is sufficient to escape discharge was a topic Congress explicitly entrusted to the core expertise of the bankruptcy courts. <u>See</u> 28 U.S.C. § 157(b)(2)(I); <u>Revere Cooper & Brass</u>, 172 B.R. at 197, (S.D.N.Y. 1994) (decision of whether claim survives discharge "is a matter of bankruptcy law"); <u>Texaco</u>, 182 B.R. at 947 ("A bankruptcy court is undoubtedly

the best qualified to interpret and enforce its own orders including those providing for discharge and injunction and, therefore, should not abstain from doing so."). Not only did the Bankruptcy Court decline to address the topic, but the statements in its Opinion leave open the possibility that the Reorganized Debtors could be held liable for merely selling products post-confirmation in the ordinary course of its business. That is not and cannot be the law.

As recognized and affirmatively pled by the Antitrust Plaintiffs, in the automotive industry, an OEM awards the supply of a Wire Harness System to a Tier 1 supplier prior to the start of production and typically for a period of "four to six years" and the bidding process for the award "begins approximately three years prior to the start of production. . . ." See LaCava Complaint at 33. Thus, the "act" that could in theory give rise to antitrust harm occurs when the OEM awards the business, as the identity of the supplier and prices of such components are decided at that time.[17] Thereafter, the supplier receiving the award makes deliveries according to the schedule provided by the OEM. Given the allegations in their complaints, if the Antitrust Plaintiffs are correct that each sale (*i.e.*, delivery) constitutes an antitrust violation, then the only way the Reorganized Debtors could have made the bankruptcy discharge effective would have been, upon Plan confirmation, to terminate ***all existing contracts with their customers***. But this absurd result is not the law, and would undermine the fundamental public policy behind the bankruptcy discharge, namely, the Reorganized Debtors' right to benefit from a "fresh start."[18]

---

[17]   See *Declaration of Shari L. Burgess (I) in Support of Debtors' Chapter 11 Petitions and First Day Motions and (II) Pursuant to Local Bankruptcy Rule 1007-2* [Docket No. 32] ("Each of the Company's seating systems is engineered and designed in partnership with the applicable OEM customer. Key components of each system must be designed, tested and validated for quality, appearance and safety—a process that can take several years.").

[18]   None of this, of course, leaves the Antitrust Plaintiffs without a remedy for *either* pre- or post-discharge damages. The Antitrust Plaintiffs can recover pre-discharge damages from any non-discharged defendant that they can prove acted in concert to commit anticompetitive acts causing such damages, and they also can recover post-discharge damages from any defendant that acted in concert post-discharge to commit anticompetitive acts causing such damages.

In light of this, the Reorganized Debtors' position on this point is a simple one:  if a supply of Wire Harness Systems was awarded by one of the Reorganized Debtors' customers *pre*-confirmation and the Antitrust Plaintiffs cannot identify a ***post***-confirmation illegal agreement or collusive act, then the Reorganized Debtors cannot be held liable for sales of these Wire Harness Systems that take place post-confirmation.  This is and must be the law because, as noted above, pre-confirmation claims (i.e., assertions of liability arising from the Reorganized Debtors' pre-confirmation conduct) have been discharged; the Bankruptcy Court held as much, and the Antitrust Plaintiffs have not cross-appealed this point.  Order ¶¶ 3–4; see Texaco, 182 B.R. at 951–53 (discharging claims because "[a]ll the physical events required to establish the elements of causation and damage for such claims occurred prior to confirmation"); Envirodyne, 206 B.R. at 472 (citing Texaco and Chateaguay and deeming antitrust claims based on pre-confirmation conduct discharged); In re Penn Cent. Transp. Co., 771 F.2d 762, 767 (3d Cir. 1985) (same); Myers, 2009 WL 891751 (because of the discharge, pre-confirmation conduct is "irrelevant").  ***Pre***-confirmation conduct is irrelevant to, and cannot be considered when making, a determination of whether a ***post***-confirmation claim exists.

In other words, Antitrust Plaintiffs may rely only on post-confirmation acts to prove the existence of a post-confirmation claim, because claims on account of ***pre***-confirmation conduct have been discharged.  See Order ¶ 3 ("Antitrust Plaintiffs . . . are enjoined from . . . continuing the prosecution of claims . . . based on conduct by the Reorganized Debtors that occurred before the Effective Date.").  Thus, even assuming (incorrectly) that the Reorganized Debtors were part of a pre-confirmation conspiracy, it cannot be enough to show that the Reorganized Debtors "sold product" covered by pre-confirmation contracts after the Plan confirmation date.  Allowing the Antitrust Plaintiffs to pursue the Reorganized Debtors based on such mere sales would again

allow them to claim post-confirmation damages based on pre-confirmation events. This is inconsistent with established bankruptcy law and policy. Instead, Antitrust Plaintiffs must plead and ultimately prove all legal and factual elements of a price fixing conspiracy as to the Reorganized Debtors and all such elements must have arisen after Plan confirmation.

Indeed, the Court of Appeals for the Sixth Circuit addressed a near-identical situation in In re Travel Agent Comm'n Antitrust Litig., 583 F.3d 896 (6th Cir. 2009). Travel Agent alleged a conspiracy between major airlines to reduce and then eliminate travel agent commissions, payments that had been made to agents for selling airline tickets. Id. at 898. Commissions had been eliminated fully prior to United's emergence from chapter 11 protection, but the plaintiffs alleged that the conspiracy continued thereafter and that a new antitrust claim accrued each time that United failed to pay travel agents a commission when they sold United tickets. Id. at 902. The Sixth Circuit flatly rejected that argument and enforced the bankruptcy discharge. The court recognized that an antitrust defendant's alleged maintenance of an anti-competitive agreement **both prior to and after** confirmation of the chapter 11 plan did not establish a "new" conspiracy giving rise to liability. Without an agreement and overt act committed post-confirmation, the entire claim was deemed discharged, even the claim based on tickets sold post-confirmation. Id. at 901-02; see also In re WorldCom, Inc., 546 F.3d 211, 221 (2d Cir. 2008) (continuing trespass deemed discharged pre- and post-confirmation because liability was based solely on the pre-confirmation installation of cables and the post-confirmation "failure to remove the cables"); Republic Bank & Trust Co. v. Hutchinson, 444 B.R. 728, 733 (W.D.K.Y. 2011) (malpractice claim discharged in full despite plaintiff's claim that the debtor failed to correct the alleged malpractice post-confirmation) ("The fact that [debtor] had the ability to correct the negligence

prior to any damages is not independent [post-confirmation] conduct.  At best, it is a mere 'reaffirmation of a previous act' resulting in injuries with a 'rippling effect into the future.'").

In the end, whether the Antitrust Plaintiffs' claims survive discharge is not a factual issue, and it certainly is not one that should have been left for the MDL Court.  As Congress explicitly contemplated by making it "core," discharge is a concept best addressed and resolved in a bankruptcy context.[19]  And if the Bankruptcy Code's "fresh start" doctrine is to mean anything, it must, at the very least, mean that pre-confirmation conduct by the Reorganized Debtors is wiped clean as of the date of Plan confirmation — i.e., anything that took place before confirmation cannot be used to satisfy the Antitrust Plaintiffs' pleading or proof burdens.  Compare Schultz v. Shapiro (In re Shapiro), 59 B.R. 844, 847 (Bankr. E.D.N.Y.1986) ("The relief of discharge is a cornerstone of the debtor's 'fresh start' in bankruptcy. It enables the debtor to begin his post-bankruptcy life with a clean slate vis-a-vis his creditors.").  The Bankruptcy Court's Order opens the door to that possibility, and this Court should close it.

## CONCLUSION

For all of the foregoing reasons, the Bankruptcy Court's Order and Memorandum Opinion should be reversed in part.

---

[19]  It is settled law that core bankruptcy questions like the scope of the discharge are important matters for, and should be settled in, the bankruptcy court that confirmed the plan giving rise to discharge.  See, e.g., In re Chicago, Milwaukee, St. Paul & Pac. Ry. Co., 6 F.3d 1184, 1194 (7th Cir. 1993) ("the reorganization court should not abstain from interpreting its own consummation order absent extraordinary circumstances"); In re Conseco, Inc., 330 B.R. 673, 683 (Bankr. N.D. Ill. 2005) ("when the question involves a central bankruptcy right like the discharge, the court has core jurisdiction."); In re Kewanee Boiler Corp., 270 B.R. at 917 (Bankr. N.D. Ill. 2002); Hawaiian Airlines, Inc. v. Mesa Air Group, Inc., 355 B.R. 214, 218 (D. Haw. 2006) ("The law is clear that '[a] bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders, particularly when disputes arise over a bankruptcy plan of reorganization.'") (citing cases); Envirodyne Indus., 206 B.R. at 471 (question of whether claim was barred by the discharge injunction is core); In re CD Realty Partners, 205 B.R. 651, 655 (Bankr. D. Mass. 1997)  (proceeding "to enforce the Court's confirmation order . . . is a core proceeding").

Dated:  New York, New York             Respectfully submitted,
        April 27, 2012

*/s/ Michael B. Slade*

James H.M. Sprayregen, P.C.
Marc Kieselstein
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Ryan Blaine Bennett (admitted *pro hac vice*)
Michael B. Slade (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Counsel to the Appellants