Bernard Persky
Hollis L. Salzman
Kellie Lerner
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Telephone:     (212) 907-0700
Facsimile:     (212) 818-0477

Attorneys for Appellees

Additional Appellees Listed in the Signature Block

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>LEAR CORPORATION, *et al.*,<br><br>           Reorganized Debtors.<br><br>LEAR CORPORATION, *et al.*,<br><br>           Appellants,<br><br>           v.<br><br>SUSAN LACAVA, *et al.*,<br><br>           Appellees. | Case No. 12-cv-02626 (KBF)<br><br>**Brief of Appellees** |

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

    A.    Lear's Bankruptcy .................................................................................... 2

    B.    The Antitrust Actions ............................................................................. 3

    C.    The Antitrust Actions Allege that Lear Engaged in Overt Acts Pursuant to and as Part of its Participation in Furtherance of the Price Fixing and Bid Rigging Conspiracy in the Automotive Wire Harness Systems Market ................. 4

    D.    The Bankruptcy Court Proceedings ....................................................... 7

STANDARD OF REVIEW ................................................................................................ 8

ARGUMENT .................................................................................................................... 8

    I.    The Bankruptcy Court Correctly Held that the Antitrust Court Should Decide (a) Whether Lear is Liable for Engaging in a Conspiracy to Fix the Prices of and Rig The Bids For Automotive Wire Harness Systems, and (b) the Scope of Damages ........................................................................................................ 8

    II.    The Bankruptcy Court Correctly Held that the Plaintiffs in the Antitrust Actions Could Rely on Lear's Post-Effective Date Unlawful Conduct as a Predicate to Liability ........................................................................................................ 10

        A.    Lear is Alleged to Have Engaged in Post-Effective Date Affirmative Acts Pursuant to and as Part of its Participation in Furtherance of the Price Fixing and Bid Rigging Conspiracy in the Automotive Wire Harness Systems Market ................................................................... 11

            1.    Lear's Sales of Price-Fixed Automotive Wire Harness Systems Post-November 2009 in Furtherance of the Conspiracy Are Overt Acts Rendering it Liable Under the Antitrust Laws ................................ 12

            2.    Lear's Participation Post-November 2009 in the Joint Venture with Admitted Felon Furukawa is an Overt Act in Furtherance of the Conspiracy ................................................................................. 16

            3.    Lear Did Not Engage in Any Affirmative Act to Withdraw From the Continuing Conspiracy ......................................................... 17

III.   The Bankruptcy Court Correctly Held that The Antitrust Court Should Decide
       Whether Lear is Jointly and Severally Liable for the Duration of the Entire
       Conspiracy in the Automotive Wire Harness Systems Market .......................................18

CONCLUSION...................................................................................................................... 22

## TABLE OF AUTHORITIES

*Ambook Enters. v. Time Inc.*,
    612 F.2d 604 (2d Cir. 1979)..................................................................................19

*In re Bay Point Assoc.*,
    No. 07-cv-1492, 2008 WL. 822122 (E.D.N.Y. Mar. 19, 2008).................................8

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................................3

*Browning v. MCI, Inc. (In re WorldCom, Inc.)*,
    546 F.3d 211 (2d Cir. 2008)................................................................................12

*Cf. In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    267 F.R.D. 291 (N.D. Cal. 2010) .........................................................................10

*Daniel Boone Area Sch. Dist. v. Lehman Bros., Inc.*,
    187 F. Supp. 2d 400 (W.D. Pa. 2002) ..................................................................20

*Dextone Co. v. Bldg. Trades Council of Westchester Cnty.*,
    60 F.2d 47 (2d Cir. 1932)..................................................................................20

*Garlington v. O'Leary*,
    879 F.2d 277 (7th Cir. 1989)..............................................................................17

*Hanover Shoe, Inc., v. United Shoe Mach. Corp.*,
    392 U.S. 481 (1968)..................................................................................14, 15

*Havaco of Am., Ltd. v. Shell Oil Co.*,
    626 F.2d 549 (7th Cir. 1980)..............................................................................19

*John Doe I v. Unocal Corp.*,
    395 F.3d 932 (9th Cir. 2002)..............................................................................17

*Kleen Prods., LLC v. Packaging Corp. of Am.*,
    775 F.Supp.2d 1071 (N.D. Ill. 2011) ...................................................................22

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997)..............................................................................13, 15, 16

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
    998 F.2d 1144 (3d Cir. 1993)..............................................................................14

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
    710 F. Supp. 152 (E.D. Pa. 1989) ...................................................................20, 21

*In re Mercedes-Benz Antitrust Litig.*,
   213 F.R.D. 180 (D.N.J. 2003).............................................................................10

*Morton's Mkt. v. Gustafson's Dairy Inc.*,
   198 F.3d 823 (11th Cir. 1999)......................................................................13, 18

*In re Motors Liquidation Co.*,
   457 B.R. 276 (Bankr. S.D.N.Y. 2011) ...........................................................8, 9

*New York ex rel. Spitzer v. Feldman*,
   No. 01 Civ. 6691, 2003 WL. 21576518 (S.D.N.Y. Jul. 10, 2003)......................19

*In re Nine West Shoes Antitrust Litig.*,
   80 F. Supp. 2d 181 (S.D.N.Y. 2000).................................................................13

*O'Loghlin v. County of Orange*,
   229 F.3d 871 (9th Cir. 2000).....................................................................12, 19

*In re Portrait Corp. of Am.*,
   406 B.R. 637 (Bankr. S.D.N.Y. 2009) ................................................................9

*TPTCC NY, Inc. v. Radiation Therapy Servs., Inc.*,
   784 F. Supp. 2d 485 (S.D.N.Y. 2011).................................................................17

*Texas Indust. v. Racliff Materials, Inc.*,
   451 U.S. 630 (1981) ..........................................................................................20

*In re Travel Agent Commission Antitrust Litig.*,
   583 F.3d 896 (6th Cir. 2009)...............................................................14, 15, 16

*United States v. Abelis*,
   146 F.3d 73 (2d Cir. 1998)................................................................................16

*United States v. Aleskerova*,
   300 F.3d 286 (2d Cir. 2002)..............................................................................16

*United States v. Amato*,
   540 F.3d 153 (2d Cir. 2008)..............................................................................20

*United States v. Benson*,
   79 Fed.Appx. 813, 822 (6th Cir. 2003) .............................................................19

*United States v. Borelli*,
   336 F.2d 376 (2d Cir. 1964)..............................................................................18

*United States v. Castillo*,
   814 F.2d 351 (7th Cir. 1987).............................................................................19

*United States v. Consol. Packaging Corp.*,
    575 F.2d 117 (7th Cir. 1978) ................................................................. 16

*United States v. Cont'l Grp., Inc.*,
    603 F.2d 444 (3d Cir. 1979) .................................................................. 18

*United States v. Gallerani*,
    68 F.3d 611 (2d Cir. 1995) .................................................................... 19

*United States v. Sax*,
    39 F.3d 1380 (7th Cir. 1994) ................................................................. 18

*United States v. Silva*,
    781 F.2d 106 (7th Cir. 1987) ................................................................. 16

*United States v. Xheka*,
    704 F.2d 974 (7th Cir. 1983) ................................................................. 16

*Wilk v. Am. Med. Ass'n*,
    735 F.2d 217 (7th Cir. 1983) ................................................................. 16

*In re Worldcom, Inc.*,
    Nos. 02-13533, 11-Civ-5463, 2011 WL 6434007 (S.D.N.Y. Dec. 22, 2011) .......................... 8

## STATUTES

28 U.S.C. § 1334(c)(1) ................................................................................. 2, 8, 22

28 U.S.C. § 1407 .......................................................................................... 3

45 U.S.C. § 701 ........................................................................................... 20

## <u>INTRODUCTION</u>

Defendant Lear Corporation ("Lear") asks this Court to reverse a thorough, well-reasoned Bankruptcy Court decision and essentially provide it with a "get out of jail free card" immunizing it from its participation in a massive, long-standing price-fixing and bid-rigging conspiracy in the Automotive Wire Harness Systems[1] market because it obtained a release in bankruptcy effective November 9, 2009.  But Lear engaged in unlawful anticompetitive conduct even after it emerged from bankruptcy by continuing to sell Automotive Wire Harness Systems and profit from such sales pursuant to and as part of its participation in furtherance of the price-fixing and bid-rigging conspiracy in that market.  The Bankruptcy Court was correct in exercising its discretion and deferring to the Antitrust Court (as defined below) the antitrust liability issues that are raised by Lear's affirmative acts after it emerged from bankruptcy.

Bankruptcy policy affords debtors a fresh start, but it cannot reasonably be doubted that a debtor is responsible for the consequences of its unlawful actions after it emerges from Chapter 11.  As the Bankruptcy Court correctly held, if bankruptcy law discharges a claim or liability, but the debtor takes affirmative acts and incurs a similar liability after receiving its discharge, there would be no entitlement to an injunction against prosecuting claims arising from the debtor's post-effective date unlawful conduct.

Lear cannot avoid liability for its post-Effective Date (as defined below) affirmative acts in violation of the antitrust laws.  The multitude of class actions filed against Lear allege, *inter alia*, that it engaged in a continuing conspiracy even after it emerged from bankruptcy and for

---

[1] "Automotive Wire Harness Systems" are automotive electrical distribution systems used to direct and control electronic components, wiring, and circuit boards in an automotive vehicle.  Essentially, Automotive Wire Harness Systems serve as the "central nervous system" of a motor vehicle.  Compl., *Beck v. Delphi Auto. LLP*, 11-CV-15445 (E.D. Mich. Dec. 12, 2011) (the "Beck Compl."), at ¶ 3.  "Automotive Wire Harness Systems" include the following: automotive electrical wiring, lead wire assemblies, cable bond, automotive wiring connectors, automotive wiring terminals, electronic control units, fuse boxes, relay boxes, junction blocks, and power distributors.  *Id.*

which it should be held jointly and severally liable along with its co-conspirators.  The

complaints allege post-Effective Date unlawful conduct, including that:

- After Lear's emergence from Chapter 11 bankruptcy proceedings on November 9, 2009, Lear continued to sell Automotive Wire Harness Systems pursuant to and as part of its participation in furtherance of the unlawful antitrust conspiracy;

- Lear actively participated in a joint venture post-November 2009 with Furukawa Electric Co., Ltd., a company that pleaded guilty to engaging in a criminal conspiracy to price fix and bid rig in the Automotive Wire Harness Systems market; and

- From and after November 2009, Lear had significant Automotive Wire Harness Systems sales in the United States at supra-competitive prices and profited therefrom.

Based on these and other actions (some of which have yet to be determined in discovery), well-

established antitrust law provides that Lear is jointly and severally liable for the damages caused

during the entire period of the conspiracy.  Bankruptcy law does not call for a different

conclusion.

In any event, the Bankruptcy Court did not decide these substantive questions, but

instead, pursuant to 28 U.S.C. § 1334(c)(1), deferred decision on such core antitrust issues to the

Antitrust Court.  Lear has failed to meet its burden of demonstrating that, in doing so, the

Bankruptcy Court abused its discretion.  Accordingly, this Court should affirm the Bankruptcy

Court's decision and order.

## BACKGROUND

### A.    Lear's Bankruptcy

On July 7, 2009, Lear filed a petition for relief under Chapter 11 of the Bankruptcy Code.

Memorandum of Opinion (Judge Allan Gropper, Feb. 10, 2012) ("Memorandum Opinion"), at

4.[2]  The Bankruptcy Court confirmed Lear's reorganization plan on November 5, 2009 and it became effective on November 9, 2009 (the "Effective Date").  *Id*. at 6.

## B.    The Antitrust Actions

On October 5, 2011, Plaintiff Susan LaCava filed the first class action against Defendants Delphi Automotive LLP, Furukawa Electric Co., Ltd. ("Furukawa"), Lear, Leoni AG, Sumitomo Electric Industries, Ltd., S-Y Systems Technologies, GmbH, Yazaki Corp., and Yazaki North America Inc. (collectively "Defendants"), the largest suppliers of Automotive Wire Harness Systems globally and in the United States, for engaging in a massive, decade-long conspiracy to unlawfully fix and artificially raise the prices of these products.  *LaCava v. Delphi Automotive LLP, et al*., No. 2:11-cv-14399 (E.D. Mich.) (the "LaCava Compl.").

Over thirty complaints have been filed since then against the leading suppliers of Automotive Wire Harness Systems, including Lear (the "Antitrust Actions").  The complaints in the Antitrust Actions make essentially the same allegations involving a price-fixing and bid-rigging conspiracy in the sale of Automotive Wire Harness Systems, in violation of federal and state antitrust laws (the "Antitrust Claims").[3]  On February 7, 2012, the Judicial Panel for Multidistrict Litigation transferred the Antitrust Actions to the Eastern District of Michigan (the "Antitrust Court") pursuant to 28 U.S.C. § 1407.  *See In re Auto. Wire Harness Sys. Antitrust Litig*., MDL No. 2311 (J.P.M.L.).

On March 29, 2012, the Antitrust Court issued Case Management Order No. 1, directing the "Direct Purchaser Plaintiffs, the Automobile Dealer Plaintiffs, and the End-Payor Plaintiffs" to each "file a Consolidated Amended Complaint forty-five (45) days after the Court's entry of

---

[2] Attached for the Court's convenience is an Appendix containing the following items designated as part of the record on appeal: 1) the Bankruptcy Court's Order; 2) the Memorandum Opinion; 3) the December 16, 2011 Hearing Transcript, and 4) the Beck Complaint.

[3] All facts alleged in the Complaints must be assumed as true.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

this Case Management Order No. 1." The Antitrust Plaintiffs filed Consolidated Amended

Complaints on May 14, 2012, each of which alleged that Lear continued to sell Automotive Wire

Harness Systems pursuant to and as part of its participation in furtherance of the conspiracy from

and after November 9, 2009, and that it also had significant Automotive Wire Harness Systems

sales in the United States at supra-competitive prices post-Effective Date.[4]  *See* Consolidated

Am. Compls., 2:12-md-02311-MOB, Ecf Nos. 85, 86, and 87.

> **C.**     **The Antitrust Actions Allege that Lear Engaged in Overt Acts Pursuant to
> and as Part of its Participation in Furtherance of the Price Fixing and Bid
> Rigging Conspiracy in the Automotive Wire Harness Systems Market**

In the Antitrust Actions, Plaintiffs allege a continuing and ongoing conspiracy among the

Defendants, including Lear, from at least January 2000 through October 2011.  Specifically, the

Beck Complaint, ¶ 42, alleges that:

> After [Lear's] emergence from Chapter 11 bankruptcy proceedings
> on November 9, 2009, Lear continued to sell Automotive Wire
> Harness Systems pursuant to and as part of its participation in
> furtherance of the conspiracy.  From and after November 2009,
> Lear had significant Automotive Wire Harness Systems sales in
> the United States at supra-competitive prices.

The Beck Complaint further alleges that Defendants, including Lear, and other co-

conspirators "agreed, combined, and conspired to inflate, fix, raise, maintain, or artificially

stabilize prices of Automotive Wire Harness Systems" "from at least January 2000 through the

date of the filing of the Complaint."  Beck Compl., ¶¶ 2, 5; *see also Nicoud v. Furukawa Elec.

Co. Ltd.*, No. 11-cv-05057 (N.D. Ca. Oct. 14, 2011) ¶1.  The Beck Complaint goes on to allege

that Lear "directly and/or through its subsidiaries, which it wholly owned and/or controlled –

---

[4] The allegations in the Consolidated Amended Complaints filed by the plaintiffs in the Antitrust Actions (the
"Antitrust Plaintiffs") with regard to Lear's post-Effective Date conduct are essentially identical to those allegations
contained in the Beck Complaint which were referred to during the oral argument on Lear's motion, *see In re Lear
Corporation*, Dec. 16, 2012 Hr'g Tr. ("Hearing Transcript"), at 24-28, and in the Bankruptcy Court's decision.  *See*
Mem. Op. at 8.  Thus, for ease of reference, Antitrust Plaintiffs will rely on the allegations in the Beck Complaint,
which is part of the record on appeal and included in the Appendix to this Brief.

manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period." Beck Compl. ¶ 38. The Class Period is defined as the period from and including January 1, 2000 up to and including the date of the filing of the Complaint—October 5, 2011. Beck Compl., ¶¶ 2, 38.

As alleged in the complaints in the Antitrust Actions, as well as subsequent and continuing investigations, according to Lear's 2010 Annual Report, Lear's net sales ending December 31, 2010 were $11.954 billion.[5] Of that, $2.559 billion were from the sales of Lear's Electrical Power Management Systems, which include Lear's 2010 sales of Automotive Wire Harness Systems. *See* 2010 Annual Report, at 43. Lear's 2010 Annual Report further states that its Electrical Power Management Systems "business segment represents a significant sales growth and margin improvement opportunity for Lear," and that it "launched key products for the all-new Chevrolet Volt, where we are the supplier of both the traditional and high-power electrical distribution systems and related electrical components . . . ." *Id.* at 4-5. In addition, in the first quarter of 2011, Lear had Electrical Power Management Systems net sales of $786.7 million,[6] and second quarter Electrical Power Management Systems net sales of $816.4 million.[7] Thus, Lear's cumulative sales in the first half of 2011, for the portion of its business which includes Automotive Wire Harness Systems sales, were $1.603 billion.

The complaints in the Antitrust Actions cite the globally coordinated antitrust investigation being conducted in the United States, Europe, and Japan, aimed at suppliers of Automotive Wire Harness Systems, including Lear. Beck Compl. ¶¶ 90-97. Indeed, Lear's

---

[5] *See* Plaintiffs' Joint Response in Opposition to Debtor's Motion for Entry of an Order (A) Enforcing Chapter 11 Plan Discharge and Injunction and (B) Directing Dismissal of Pending Litigation, Lear Corporation Annual Report 2010, p. 36, attached to the Persky Declaration as Exhibit B (the "Joint Response").

[6] *See* Lear Corp Form 10-Q (Quarterly Report), Filed 04/29/11 for the Period Ending 04/02/11, p. 19, Attached to the Persky Declaration as Exhibit C.

[7] *See* Lear Corp Form 10-Q (Quarterly Report), Filed 08/04/11 for the Period Ending 07/02/11, p. 35, attached to the Persky Declaration as Exhibit D.

Chief Executive Officer Bob Rossiter has stated that Lear was notified in 2010 by the European

Commission ("EC"), that it is part of an ongoing, current investigation into anticompetitive

practices among automotive electrical and electric component suppliers.  Beck Compl. ¶ 93.

The complaints also allege that Lear participated in a joint venture with Furukawa, a

company that pleaded guilty to price fixing and bid rigging in the Automotive Wire Harness

Systems market.  Beck Compl. ¶ 41.  In 1987, Furukawa and United Technology Automotive,

Inc. (which was acquired by Lear in 1999) founded a joint venture, "Lear Furukawa," to

manufacture and sell Automotive Wire Harness Systems to Japanese automobile manufacturers

in North America.  *Id*.  Lear initially held an 80% stake and Furukawa held the remaining 20%.

*Id*.  In April 2009, Furukawa raised its stake from 20% to 80% and changed the name of the joint

venture to Furukawa Lear Corporation.  Lear continued to partner with Furukawa in selling price

fixed Automotive Wire Harness Systems until June 2010 (well after Lear's emergence from

bankruptcy) when Furukawa purchased the remaining 20% from Lear.  *Id.*

Furukawa and three of its executives agreed to plead guilty to violations of the federal

antitrust laws for their role in the conspiracy to rig bids for and to fix the prices of the sale of

Automotive Wire Harness Systems and related products sold to automobile manufacturers in the

United States and elsewhere—the very same conspiracy in which the complaints in the Antitrust

Actions allege Lear is involved.  Beck Compl. ¶¶ 98-107.  The United States Antitrust Division

of the Department of Justice (the "DOJ") announced in a press release that Furukawa

participated in the conspiracy from at least as early as January 2000, until at least January

2010—well after the November 9, 2009 Effective Date of Lear's Plan in bankruptcy.  Beck

Complaint, ¶ 100.  According to the Information filed, Furukawa and its co-conspirators carried

out the conspiracy by, *inter alia*, "accepting payment for Automotive Wire Harness Systems sold

to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices." Beck Compl. ¶ 102.  Indeed, even after Lear's emergence from bankruptcy in November 2009, Lear *continued* to partner with Furukawa, an admitted felon, in the joint venture and financially benefited from the each of the sales occurring after November 2009 at the supra-competitive prices charged by the co-conspirators to their customers.[8]

### D.      The Bankruptcy Court Proceedings

On November 17, 2011, Lear filed a motion in the Bankruptcy Court, Southern District of New York (Judge Allan Gropper), requesting entry of an order (i) enforcing the discharge provisions of its joint plan of reorganization, and (ii) directing dismissal of the Antitrust Actions. The parties fully briefed Lear's motion and the Bankruptcy Court heard oral argument on the motion on December 16, 2011.  *See* Hr'g Tr.

On February 10, 2012, the Bankruptcy Court issued a Memorandum Opinion, which held that:

> The Antitrust Plaintiffs hold "claims" against the Reorganized Debtors that should be enjoined to the extent they arose before November 9, 2009, the Effective Date of the Plan (the "Effective Date").  However, the Antitrust Plaintiffs are entitled to seek recovery from Lear on their alleged post-Effective Date claims, and the question of Lear's liability under antitrust law for post-Effective Date conduct should be determined in the antitrust litigation, not in this Court.

Mem. Op. at 3-4.

---

[8]   These allegations have been included in a Consolidated Amended Complaint filed by the End-Payor Plaintiffs on May 14, 2012, as well as other consolidated amended complaints filed on that day in the Multidistrict Litigation Court presiding over the Antitrust Actions.  *See* Consolidated Am. Compls. 2:12-md-02311-MOB, Ecf Nos. 85, 86, and 87.

## STANDARD OF REVIEW

The standard of review applicable to bankruptcy matters is governed by the Federal Rules of Bankruptcy Procedure. *In re Worldcom, Inc.*, Nos. 02–13533, 11-Civ-5463, 2011 WL 6434007, at *2 (S.D.N.Y. Dec. 22, 2011). "On appeal, the court 'may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings.'" *Id.* (quoting Fed. R. Bankr. P. 8013). Here, the standard of review of the Bankruptcy Court's decision under 28 U.S.C. § 1334(c)(1) to exercise its discretion and abstain from deciding the antitrust issues raised by Lear's motion is for an abuse of discretion. *E.g.*, *In re Bay Point Assoc.*, No. 07-cv-1492, 2008 WL 822122, at *3 (E.D.N.Y. Mar. 19, 2008) ("When reviewing a bankruptcy court's decision to permissively abstain, district courts consider whether the bankruptcy court abused its discretion.") (citing *In re: Pan Am. World Airways, Inc.*, 950 F.2d 839, 844 (2d Cir. 1991)).

## ARGUMENT

**I.    The Bankruptcy Court Correctly Held that the Antitrust Court Should Decide (a) Whether Lear is Liable for Engaging in a Conspiracy to Fix the Prices of and Rig The Bids For Automotive Wire Harness Systems, and (b) the Scope of Damages**

The Bankruptcy Court expressly stated that it "can and should decide the relevant issues of bankruptcy law." Mem. Op. at 9. However, "[w]hether Lear's post-Effective Date conduct makes it liable under antitrust principles – and jointly and severally liable for all the effects of the alleged conspiracy – is a separate issue that can and should be decided in the antitrust litigation itself." *Id*.

The Bankruptcy Court noted that, in appropriate cases, "bankruptcy courts have abstained in favor of a federal court, as § 1334(c)(1) provides for abstention 'in the interest of justice.'" Mem. Op. at 11 (citing *In re Motors Liquidation Co.*, 457 B.R. 276 (Bankr. S.D.N.Y. 2011))

(discretionary abstention in favor of U.S. District Court for Eastern District of Michigan in Labor-Management Relations Act dispute) and *In re Portrait Corp. of Am.*, 406 B.R. 637 (Bankr. S.D.N.Y. 2009) (discretionary abstention in favor of U.S. District Court for Northern District of Ohio in trademark action).  Both *Motors Liquidation* and *Portrait* held that discretionary abstention may be warranted under the "interest of justice" clause depending on a number of factors, including, (1) the extent to which non-bankruptcy law issues predominate over bankruptcy issues, (2) the presence of a related proceeding commenced in another non-bankruptcy court, (3) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (4) the presence in the proceeding of non-debtor parties.  Mem. Op. at 11; *see also In re Motors Liquidation Co.*, 457 B.R. at 289; *In re Portrait Corp. of Am.*, 406 B.R. at 641-42.

In accord with the foregoing authorities, the Bankruptcy Court prudently held that "the core bankruptcy issues can be severed from the antitrust issues, and the antitrust issues that are raised are not readily answered on the instant record."  Mem. Op. at 12.  Rather, "***the just disposition is for this Court to decide the bankruptcy issues and abstain in favor of a decision by the antitrust court on other issues that primarily involve antitrust law***."  *Id.* (emphasis added).

The Bankruptcy Court correctly determined that the Antitrust Actions involve core issues of antitrust law.  For instance, whether Lear is liable for its post-Effective Date unlawful conduct will require analyzing questions of antitrust law, such as:

- What conduct constitutes an antitrust violation;

- When does a cause of action accrue under antitrust law; and

- If there is antitrust liability for post-Effective Date unlawful conduct, what is the scope of that liability.

These questions raise fundamental antitrust issues, not bankruptcy issues. *Cf. In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 300 (N.D. Cal. 2010) (holding that questions of law common to a class in an antitrust case include (1) whether defendants engaged in a conspiracy to fix, raise, maintain, or stabilize prices; (2) whether the conspiracy violated Section 1 of the Sherman Act; (3) the duration of the illegal conspiracy; and (4) whether class members were injured by defendants' conduct, and, if so, the appropriate scope of damages); *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180, 186-87 (D.N.J. 2003) (holding that common questions of fact in an antitrust conspiracy include whether there was a violation of the antitrust laws, the fact of antitrust injury, and what damages were sustained).

The Bankruptcy Court's holding is also correct because the Antitrust Actions are just at the pleading stage and discovery has not yet commenced. The record is not sufficient to provide a full picture of Lear's post-Effective Date wrongdoing. The Bankruptcy Court properly concluded that "[t]he nature and extent of Lear's conduct after the Effective Date of the Plan in violation of the antitrust laws, if any, and its effect are issues that can and should be decided by the antitrust court in connection with the prosecution of a consolidated amended complaint." *See* Mem. Op. at 18-19. The court reasoned that "[t]hey involve intensely factual inquiries and are not susceptible to determination on the existing record." *Id.* at 19.

## II. The Bankruptcy Court Correctly Held that the Plaintiffs in the Antitrust Actions Could Rely on Lear's Post-Effective Date Unlawful Conduct as a Predicate to Liability

The Bankruptcy Court held that it would "enjoin the Antitrust Plaintiffs and all similarly situated plaintiffs from commencing or continuing the prosecution of claims based on conduct by [Lear] that occurred ***before*** the Effective Date. However, Lear is not entitled to an injunction

barring the Antitrust Plaintiffs from amending their complaints in the antitrust actions to ***rely on***

***post-Effective Date conduct as a predicate to liability*** or from seeking to measure the liability by

activity prior to the Effective Date."  Mem. Op. at 19 (emphasis added).

Nowhere does Lear dispute that post-Effective Date unlawful conduct is not shielded

from liability.  Instead, Lear argues that its post-Effective Date conduct as alleged in the

complaints in the Antitrust Actions could not give rise to liability.  However, these arguments are

premature and well outside the scope of the Bankruptcy Court's decision, which merely held that

the Antitrust Court, and not the Bankruptcy Court, should decide these core antitrust issues.

Lear, in essence, is asking this Court to issue an advisory opinion on whether its acts as alleged

in the Antitrust Actions are a sufficient basis for antitrust liability.  While the Antitrust Plaintiffs

believe that, given the limited scope of the Bankruptcy Court's decision, Lear's request is both

speculative and premature, Plaintiffs will nonetheless address the substance of Lear's arguments.

A. **Lear is Alleged to Have Engaged in Post-Effective Date Affirmative Acts Pursuant to and as Part of its Participation in Furtherance of the Price Fixing and Bid Rigging Conspiracy in the Automotive Wire Harness Systems Market**

The complaints in the Antitrust Actions allege that, after Lear's emergence from

bankruptcy on November 9, 2009, Lear continued to sell Automotive Wire Harness Systems

pursuant to and as part of its participation in furtherance of the unlawful conspiracy.  They also

allege that Lear actively participated post-Effective Date in a joint venture with a company

convicted of price fixing and bid rigging in the Automotive Wire Harness Systems market.

Significantly, Lear does not allege that it withdrew from the conspiracy to price fix and rig bids

in the Automotive Wire Harness Systems market either before or after the Effective Date.  Thus,

Lear is liable for its post-Effective Date unlawful conduct.

As the Bankruptcy Court aptly stated:

> Bankruptcy policy affords debtors a fresh start, but a debtor is
> responsible for the consequences of its actions after it emerges
> from chapter 11, and if bankruptcy law discharges a liability, but
> the debtor takes new action and incurs a similar liability after
> receiving its discharge, there may be no entitlement to an
> injunction against prosecution of the latter.

Mem. Op. at 19 (citing *Browning v. MCI, Inc.* (*In re WorldCom, Inc.*), 546 F.3d 211, 220-21 (2d
Cir. 2008) (putative class action claim discharged because claimant failed to allege illegal post-
confirmation conduct by debtor) and *O'Loghlin v. County of Orange*, 229 F.3d 871, 875 (9th Cir.
2000) ("A 'fresh start' means only that; it does not mean a continuing licence [sic] to violate the
law.").

### 1.    Lear's Sales of Price-Fixed Automotive Wire Harness Systems Post-November 2009 in Furtherance of the Conspiracy Are Overt Acts Rendering it Liable Under the Antitrust Laws

The Complaints in the Antitrust Actions clearly allege that Lear and its co-conspirators
collusively implemented supra-competitive prices after 2009.  Beck Compl. ¶¶ 2, 9.  The Beck
Complaint alleges that after Lear's emergence from bankruptcy on November 9, 2009, it
continued to sell Automotive Wire Harness Systems pursuant to and as part of its participation in
furtherance of the conspiracy.  Beck Compl. ¶ 42.  Indeed, from and after November 2009, Lear
had significant Automotive Wire Harness Systems sales in the United States at supra-competitive
prices.  The Beck Complaint further alleges that all Defendants—including Lear—continued to
engage in price fixing through at least October 2011.  Beck Compl. ¶¶ 2, 9.  Thus, after
November 2009, Lear charged conspiratorially fixed prices just as it had done before November
2009, and continued to inflict financial injury on the Plaintiff Classes and to unlawfully benefit
therefrom.

Each time Lear sold an Automotive Wire Harness System after its discharge from
bankruptcy on November 9, 2009, it charged an unlawfully inflated price in furtherance of the

conspiracy.  It is a well-accepted principle of antitrust law that the act of causing each and every

one of those sales was an affirmative, overt act in furtherance of the conspiracy which financially

benefited Lear.  *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (holding that "each sale

to the plaintiff" at prices fixed pursuant to an ongoing conspiracy is an "overt act that is part of

the violation").  This well-established principle is in accord with the concept of accrual of a

cause of action in antitrust cases, which holds that in a continuing antitrust conspiracy, every sale

of a price-fixed product and every sale of a product pursuant to a market allocation or bid rigging

conspiracy constitutes a violation of the antitrust laws for which each co-conspirator is jointly

and severally liable.  As the Supreme Court specifically held:

> Antitrust law provides that, in the case of a continuing violation,
> say, a price–fixing conspiracy that brings about a series of
> unlawfully high priced sales over a period of years, each overt act
> that is part of the violation and that injures the plaintiff, *e.g.*, ***each
> sale to the plaintiff, starts the statutory period running again***,
> regardless of the plaintiff's knowledge of the alleged illegality at
> much earlier times.

*Klehr*, 521 U.S. at 189 (emphasis added) (internal quotation marks omitted); *see also Morton's

Mkt. v. Gustafson's Dairy Inc.*, 198 F.3d 823, 828 (11th Cir. 1999) ("[W]hen sellers conspire to

fix the price of a product, ***each time a customer purchases that product at the artificially

inflated price, an antitrust violation occurs***") (emphasis added); *In re Nine West Shoes Antitrust

Litig.*, 80 F. Supp. 2d 181, 192 (S.D.N.Y. 2000) (observing that each sale at a fixed price is a

"separate[ ] overt act[.]").  Because a party joins a conspiracy by committing even one overt act,

Lear's alleged involvement in hundreds or even thousands of such acts after November 2009,

amounting to billions of dollars in sales of Automotive Wire Harness Systems, brings it firmly

within the conspiracy's ambit.[9]

---

[9] Moreover, "[t]he Supreme Court has considered and rejected the argument that, in the context of a
defendant's continuing violation of the Sherman Act, the statute of limitations runs from the violation's earliest

In other words, each sale of a price-fixed Automotive Wire Harness System pursuant to the unlawful conspiracy constituted the injurious overt "act" that gave rise to Plaintiffs' antitrust claims.  As noted above, Lear continued—from the onset of the conspiracy in January 2000 and after its release in bankruptcy in November 2009—to sell Automotive Wire Harness Systems at supra-competitive prices in furtherance of its participation in the unlawful conspiracy.  It also sold Automotive Wire Harness Systems in the joint venture with Furukawa, and Furukawa has since admitted that it participated in a conspiracy to fix the prices of Automotive Wire Harness Systems from 2000 until at least January 2010.  *See* Beck Complaint, ¶¶ 41, 98-105.

Lear's heavy reliance on *In re Travel Agent Commission Antitrust Litigation,* 583 F.3d 896 (6th Cir. 2009), does not support its argument that it is not liable for it post-Effective Date unlawful conduct.  That case, in contrast to the facts here, does not address affirmative acts done pursuant to and in furtherance of a conspiracy post-bankruptcy, which is what is alleged in the Antitrust Actions.  In *Travel Agent Commission*, plaintiffs alleged defendant and other co-conspirator airlines illegally conspired to cap, cut, and eliminate base commissions in violation of the Sherman Act.  *See id.* at 900.  Each defendant successfully eliminated base commissions by May 2002 and defendant United filed for bankruptcy some time thereafter.  *See id.* at 900-01.  Plaintiffs alleged that United rejoined the conspiracy when it ***maintained*** the 0% base commission policy upon emerging from bankruptcy in 2006 by "***failing***" to pay travel agents commissions.  The district court granted United's motion to dismiss on the ground that United's maintenance post-reorganization of the "0% commission policy did not create a new § 1 claim because its decision was merely a reaffirmation of a previous act" in  March 2002 to cut its

---

impact on a plaintiff."  *In re Lower Lake Erie Iron Ore Antitrust Litig.,* 998 F.2d 1144, 1171 (3d Cir. 1993) (citing *Hanover Shoe, Inc., v. United Shoe Mach. Corp.,* 392 U.S. 481, 502 n.15 (1968)).

commissions.  *Id.* at 902 (quotations omitted).  In other words, its inaction in maintaining its pre-existing policy was not an affirmative, overt act sufficient to create new antitrust liability.

Unlike the defendant in *Travel Agent Commission* (who maintained a pre-existing commission policy fixed in place years earlier), Lear sold Automotive Wire Harness Systems after November 2009 at supra-competitive prices, and each sale was an affirmative, overt act that inflicted continuing and accumulating harm upon Plaintiffs and the Classes.  *Zenith, Hanover Shoe,* and *Klehr* make clear that each such sale is an injurious overt act as to which a new Section 1 Sherman Act cause of action accrues, regardless of whether such sales also occurred pre-confirmation.  Lear's mischaracterization notwithstanding, Plaintiffs do not allege that Lear's conduct, spanning approximately a decade, was merely the reaffirmation of an initial agreement hatched in 2000 to inflate, fix, raise, maintain, or artificially stabilize prices for Automotive Wire Harness Systems, the rippling effects of which were felt for years thereafter.  To the contrary, Plaintiffs allege a continuing conspiracy, and Lear's active, ongoing participation in that conspiracy, whereby a new Section 1 claim accrued upon each sale of a price-fixed Automotive Wire Harness System.  *See Hanover Shoe,* 392 U.S. at 502 ("[W]e are dealing with conduct which constituted a continuing violation of the Sherman Act and which inflicted continuing and accumulating harm [upon Plaintiffs]").  *See also Klehr,* 521 U.S. at 188-89.

Moreover, courts have distinguished between price-fixing and other anti-competitive acts specifically in the context of "continuing violations."  In *Travel Agent Commission*, the Court of Appeals **specifically rejected plaintiffs' continuing violation theory** because defendant's maintenance of the pre-existing 0% commission policy after emerging from bankruptcy in 2006 did not constitute an overt act—*i.e.*, the "final act to effectuate [the] conspiracy occurred in 2002, long before [defendant] emerged from bankruptcy."  *Travel Agent Commission*, 53 F.3d at 902.

15

By contrast, here, Lear affirmatively and repeatedly sold Automotive Wire Harness Systems post-confirmation.  Thus, this case is distinguishable from the decision in the *Travel Agent Commission* case, which involved only a claim of "inaction" made by travel agents against airlines.  Indeed, the Court of Appeals in *Travel Agent Commission* pointed out that the action before it was unlike a price-fixing case.  *See id*.  The court noted that the Supreme Court in *Klehr* "reiterates that the antitrust laws recognize continuing violations and, more precisely, that a new § 1 claim [under the Sherman Antitrust Act] arises each time a company sells a price-fixed product."  *Id*.  Accordingly, the holding in *In re Travel Agent Commission Antitrust Litigation* does not support Lear's position here.  *See id*.

Because the Complaints allege Lear's overt acts post November 2009 in a continuing antitrust conspiracy, Lear's assertion that it cannot be liable for such unlawful conduct is incorrect.

> **2.      Lear's Participation Post-November 2009 in the Joint Venture with Admitted Felon Furukawa is an Overt Act in Furtherance of the Conspiracy**

Committing a single overt act to further the conspiracy's goals is enough to establish liability.  *See United States v. Silva*, 781 F.2d 106, 109 (7th Cir. 1987) ("a single act is enough evidence if the circumstances permit the inference that the act was 'intended to advance the ends of the conspiracy'") (quoting *United States v. Xheka*, 704 F.2d 974, 989 (7th Cir. 1983).  "[O]nce the conspiracy has been established," as is the case here, only "slight evidence is needed to connect a particular participant" to it.  *Wilk v. Am. Med. Ass'n*, 735 F.2d 217, 219 (7th Cir. 1983) (quoting *United States v. Consol. Packaging Corp.*, 575 F.2d 117, 126 (7th Cir. 1978)); *see also United States v. Aleskerova*, 300 F.3d 286, 292 (2d Cir. 2002) ("Moreover, 'only slight evidence is required to link another defendant with a conspiracy once the conspiracy has been shown to exist.'") (quoting *United States v. Abelis*, 146 F.3d 73, 80 (2d Cir. 1998).  Indeed, even "the

circumstances surrounding a party's actions can support an inference of participation in a conspiracy." *Garlington v. O'Leary*, 879 F.2d 277, 281 (7th Cir. 1989).

Significantly, Lear's joint venture partner Furukawa, and three of its executives, pleaded guilty to participating in the very same conspiracy in which Lear is alleged to have participated and which gives rise to the Antitrust Actions.  The DOJ announced in a press release that Furukawa participated in the conspiracy from January 2000 until at least January 2010—well after November 2009, the date of Lear's release in bankruptcy.  *See* Beck Compl. ¶ 100.  Even after Lear's bankruptcy discharge, it ***continued*** to partner with Furukawa in the Automotive Wire Harness Systems joint venture and financially benefited from the supra-competitive prices charged by its co-conspirators, at least until June 2010, when Lear's interest in the joint venture was purchased by Furukawa.  *See TPTCC NY, Inc. v. Radiation Therapy Servs., Inc.,* 784 F. Supp. 2d 485, 501 (S.D.N.Y. 2011) (joint venturers each make contributions of property, financing, or effort, each with some degree of joint control, and each with a share in profits and losses of enterprise); *John Doe I v. Unocal Corp.*, 395 F.3d 932, 970 (9th Cir. 2002) (Reinhardt, J., concurring) ("It is well-established as a federal common law principle that a member of a joint venture is liable for the acts of its co-venturers.").

### 3.   Lear Did Not Engage in Any Affirmative Act to Withdraw From the Continuing Conspiracy

In addition, since the Antitrust Actions allege a continuing conspiracy commencing in or about January 2000, Lear's participation in the conspiracy must be presumed to have continued post-November 2009, unless Lear made an affirmative showing to the contrary.  Such  showing would involve its affirmative acts to effectively withdraw from the continuing conspiracy.

According to the Second Circuit, "[m]ere cessation of activity is not enough . . . there must also be affirmative action, either the making of a clean breast to the authorities, or

communication of the abandonment in a manner reasonably calculated to reach co-conspirators."
*United States v. Borelli,* 336 F.2d 376, 388 (2d Cir. 1964).  Similarly, in *Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, the court held that "***absent an affirmative showing of the termination of that agreement***, ***the conspiracy must be presumed to have continued***."  198 F.3d 823, 828-29 (11th Cir. 1999) (emphasis added).

Lear has not made—and cannot make—that showing.  Indeed, Lear has not submitted any evidence, nor has it even contended in the Bankruptcy Court or before this Court, that it engaged in any affirmative act to terminate its participation in the conspiracy.  Nor has Lear cited any authority holding that its release in bankruptcy constitutes an affirmative act that operates as a withdrawal of its participation in the conspiracy to price fix and bid rig in the Automotive Wire Harness Systems market.  Thus, Lear continued as a co-conspirator after its emergence from bankruptcy.  *See, e.g.*, *United States v. Sax*, 39 F.3d 1380, 1386 (7th Cir. 1994) (holding that defendant continued to be co-conspirator despite selling his business and leaving industry, because he did not inform all co-conspirators or the authorities); *United States v. Cont'l Grp., Inc.*, 603 F.2d 444, 467 (3d Cir. 1979) (holding that defendant remained in the conspiracy despite leaving his employer).  As such, Lear is liable for its post-Effective Date unlawful anticompetitive conduct.

## III. The Bankruptcy Court Correctly Held that The Antitrust Court Should Decide Whether Lear is Jointly and Severally Liable for the Duration of the Entire Conspiracy in the Automotive Wire Harness Systems Market

The Bankruptcy Court was correct, once again, in deferring to the Antitrust Court the resolution of this issue on an appropriate record.  Nevertheless, Lear asks this Court to entertain its substantive arguments on the scope of its antitrust liability.  As discussed above in Sections I and II, Lear's request is both speculative and premature.  In any event, its position on the scope of its liability, should the Antitrust Court so find, is simply incorrect.  If Lear participated in an

ongoing price-fixing and bid-rigging conspiracy in the Automotive Wire Harness Systems market after the Effective Date, under established principles of antitrust law, Lear can be held jointly and severally liable for the damages caused during the entire period of the conspiracy.

There can be no doubt that Lear is liable for its unlawful conduct after the Effective Date. *See In re WorldCom, Inc.,* 546 F.3d 211, 221 (2d Cir. 2008) (holding that a reorganized debtor was liable for independent conduct arising after confirmation of its bankruptcy plan); *O'Loghlin v. Cnty. of Orange,* 229 F.3d 871, 875 (9th Cir. 2000) (holding that fresh start after bankruptcy does not provide "a continuing license to violate the law").  However, Lear's liability as a co-conspirator includes its joint and several liability for the unlawful acts that occurred before November 9, 2009, as well as its unlawful conduct occurring thereafter.  It is "well recognized that a co-conspirator who joins a conspiracy with knowledge of what has gone on before and with an intent to pursue the same objectives may, in the antitrust context, be charged with the preceding acts of its co-conspirators."  *Havaco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 554 (7th Cir. 1980); *see also United States v. Gallerani*, 68 F.3d 611, 620 (2d Cir. 1995) ("Once a conspiracy has been established, the criminal liability of its members extends to all acts of wrongdoing occurring during the course of and in furtherance of the conspiracy.") (internal quotations omitted); *see also Ambook Enters. v. Time Inc.*, 612 F.2d 604, 620 (2d Cir. 1979) (holding all members of conspiracy jointly and severally liable); *New York ex rel. Spitzer v. Feldman*, No. 01 Civ. 6691, 2003 WL 21576518, at *3 (S.D.N.Y. July 10, 2003) (same); *cf. United States v. Castillo*, 814 F.2d 351, 355 (7th Cir. 1987) ("Any member of a conspiracy is liable for the acts of another co-conspirator if done in furtherance of the agreed upon conspiracy, even if acts may have been performed before the member joined the conspiracy"); *United States v. Benson*, 79 Fed.Appx. 813, 822 (6th Cir. 2003) ("A co-conspirator can generally be held liable

for 'actions done in furtherance of a conspiracy before [the particular co-conspirator] joined.'") (quoting *United States v. Gravier*, 706 F.2d 174, 177–78 (6th Cir. 1983)) (alteration in original).

The Second Circuit has held for decades "that every person who participates in a conspiracy is liable for everything done during the period of its existence regardless of the exact time at which he becomes a member or the extent of his participation." *Dextone Co. v. Bldg. Trades Council of Westchester Cnty.*, 60 F.2d 47, 48 (2d Cir. 1932); *accord United States v. Amato*, 540 F.3d 153, 163 (2d Cir. 2008) ("[I]t was well within the district court's discretion to make Amato jointly and severally liable for the entire loss EDS suffered as a result of the conspiracy even while apportioning the liability of some of his co-conspirators.").  Thus, since Lear continued its participation in the price fixing and bid rigging conspiracy after it emerged from bankruptcy, it is jointly and severally liable for all of the damages caused by that conspiracy, including the period prior to November 9, 2009.

Because Lear participated in the conspiracy after emerging from bankruptcy, its bankruptcy release does not shield it from liability for damages occurring before November 2009.  This result is consistent with applicable precedent.  In *In re Lower Lake Erie Iron Ore Antitrust Litigation* ("*Lower Lake Erie*")*, 710 F. Supp. 152 (E.D. Pa. 1989), the court applied that basic principle in the bankruptcy context, holding that "[e]ach participant in an antitrust conspiracy is liable for the ***entire amount of damages caused by the conspiracy*** . . . ." *Id.*[10] (citing *Texas Indust. v. Racliff Materials, Inc.,* 451 U.S. 630 (1981)) (emphasis added).  In that case, plaintiffs sought to hold defendant Conrail liable for damages sustained as a result of an almost 22 year conspiracy (from 1958 through 1980) to monopolize the transportation of iron

---

[10] Although *Lower Lake Erie* was decided under the Regional Rail Reorganization Act, 45 U.S.C. § 701, *et seq.,* which is a pre-Bankruptcy Code statute, the principles embodied in that decision should apply here.  Indeed, courts continue to cite *Lower Lake Erie* with approval for the proposition that co-conspirators may be "liable for acts committed prior to their joining the conspiracy." *Daniel Boone Area Sch. Dist. v. Lehman Bros., Inc.*, 187 F. Supp. 2d 400, 414 (W.D. Pa. 2002).

ore, based on Conrail's conduct after its assumption of ownership in 1976 of bankrupt

northeastern railroads that allegedly participated in the conspiracy.[11]   Conrail contended that (1)

it could not be held liable for damages occurring before 1976, and (2) subjecting it to liability for

the entire period of the conspiracy would be contrary to the public policies intended by Congress

underlying the Railroad Reorganization Act, including that Conrail "start with a 'clean slate'."

*See Lower Lake Erie,* 710 F. Supp. at 154.

The *Lower Lake Erie* Court rejected both of Conrail's contentions and held that Conrail

was potentially liable for the entirety of damages caused by the conspiracy.  First, it relied in part

on the well-established antitrust principle of joint and several liability:

> "Those who, with knowledge of the conspiracy, aid or assist in the
> carrying out of the purposes of the conspiracy, make themselves
> party thereto and are equally liable [for] or guilty with the original
> conspirators".

*See id.*

Second, the Court noted that the "Rail Act does reflect a congressional intent to enable

Conrail to start out, as of April 1, 1976, with a clean slate."  *See id.*  However, "***there is plainly***

***no basis for suggesting that Congress wished to enable Conrail to engage in an antitrust***

***conspiracy thereafter without incurring the same penalties as other antitrust violators***."  *Id.*

(emphasis added).  Thus, if plaintiffs' allegations concerning Conrail's participation in the

conspiracy post-1976 proved true, "Conrail would thereby be rendered liable for all of the

damages caused by the conspiracy  . . ."  *Id* at 155.  Congress' intent to provide Lear with a

"fresh start" by discharging "claims" by operation of the Bankruptcy Code is analogous to the

intent embodied in the Rail Act to provide Conrail a "clean slate" in 1976 upon its assumption of

---

[11] Conrail was created pursuant to the Regional Rail Reorganization Act to assume ownership and operation of the rail properties of the bankrupt northeastern railroads.  The mandated conveyance of the rail properties to Conrail was effective as of April 1, 1976.  *Id.*

ownership of the bankrupt northeastern railroads.  That purpose, however, provides no basis for concluding that the Bankruptcy Code operates as a shield from liability, which would permit Lear to participate in an antitrust conspiracy without incurring the same penalties as its co-conspirators.  *See, e.g.*, Mem. Op., *Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F.Supp.2d 1071, 1081-82 (N.D. Ill. 2011) (finding bankrupt defendant could be held liable for its post-discharge antitrust violations and that pre-discharge violations could be considered with respect to specific issues such as intent).

In any event, the scope of Lear's antitrust liability for its post-Effective Date participation in the conspiracy was ***not*** decided by the Bankruptcy Court.  That Court wisely and prudently held that, ***if*** Lear were ultimately held liable under the antitrust laws for its post-Effective Date unlawful conduct, the scope and extent of that liability is to be determined by the Antitrust Court.  Mem. Op. at 19 ("The questions of Lear's antitrust liability for post-Effective Date conduct and the scope of damages, if any, are for the antitrust court to decide on a more complete record.").  The Bankruptcy Court's decision was manifestly correct.

## CONCLUSION

For the foregoing reasons, Lear has failed to meet its burden of demonstrating that the Bankruptcy Court's deferral of the antitrust issues for decision by the Antitrust Court, pursuant to 28 U.S.C. § 1334(c)(1), was an abuse of discretion.  Accordingly, Antitrust Plaintiffs respectfully request that this Court affirm the Bankruptcy Court's decision.

Dated: May 22, 2012        Respectfully Submitted,

By:    */s/ Bernard Persky*
        Bernard Persky
        Hollis L. Salzman
        Kellie Lerner
        LABATON SUCHAROW LLP
        140 Broadway
        New York, New York 10005
        (212) 907-0700
        bpersky@labaton.com
        hsalzman@labaton.com
        klerner@labaton.com

        *End-Payor Interim Co-Lead Class Counsel*

        Marc M. Seltzer
        Steven G. Sklaver
        SUSMAN GODFREY L.L.P.
        1901 Avenue of the Stars, Suite 950
        Los Angeles, California 90067-6029
        (310) 789-3100
        mseltzer@susmangodfrey.com
        ssklaver@susmangodfrey.com

        *End-Payor Interim Co-Lead Class Counsel*

        E. Powell Miller
        Adam T. Schnatz
        The Miller Law Firm, P.C.
        950 W. University Dr., Ste. 300
        Rochester, Michigan 48307
        (248) 841-2200
        epm@millerlawpc.com
        ats@millerlawpc.com

        *End-Payor Interim Liaison Counsel*

        Francis O. Scarpulla
        Craig C. Corbitt
        Christopher T. Micheletti
        Judith A. Zahid
        Demetrius X. Lambrinos
        Heather T. Rankie
        ZELLE HOFMAN VOELBEL & MASON LLP
        44 Montgomery Street, Suite 3400

San Francisco, California 94104
(415) 693-0700
fscarpulla@zelle.com
ccorbitt@zelle.com
cmicheletti@zelle.com
jzahid@zelle.com
hrankie@zelle.com
dlambrinos@zelle.com

*Counsel for Plaintiff Craig Kelly and Tye Smith*

Anthony L. DeLuca
ANTHONY L. DELUCA, PLC
Grand Marais Professional Centre
14950 East Jefferson Avenue, Suite 170
Grosse Pointe Park, Michigan 48230
(313) 821-5905
anthony@aldplc.com

Francis O. Scarpulla
Craig C. Corbitt
Christopher T. Micheletti
Judith A. Zahid
Demetrius X. Lambrinos
Heather T. Rankie
ZELLE HOFMANN VOELBEL & MASON LLP
44 Montgomery Street, Suite 3400
San Francisco, California 94104
(415) 693-0700
fscarpulla@zelle.com
ccorbitt@zelle.com
cmicheletti@zelle.com
jzahid@zelle.com
dlambrinos@zelle.com
hrankie@zelle.com

Gregory J. Semanko
GREGORY J. SEMANKO, P.A.
23427 735th Avenue
Dassel, Minnesota 55325
(612) 226-0262
gregoryjsemankopajr@embarqmail.com

Michael Belancio
FOLAND, WICKENS, EISFELDER, ROPER
& HOFER, PC
Commerce Tower

911 Main Street, 30th Floor
Kansas City, Missouri 64105
(816) 472-7474
mbelancio@fwpclaw.com

*Counsel for Plaintiffs Jennifer Chase, Curtis
Gunnerson, Kelly Klosterman, David Rochon and
Darrel Senior*

Mark S. Goldman
Brian D. Penny
GOLDMAN SCARLATO KARON
& PENNY, P.C.
101 E. Lancaster Avenue, Suite 204
Wayne, Pennsylvania 19087
(484) 342-0700
goldman@gskplaw.com
penny@gskplaw.com

M. Stephen Dampier
LAW OFFICES OF
M. STEPHEN DAMPIER, P.C.
55 N. Section Street
P. O. Box 161
Fairhope, Alabama 36533
(251) 929-0800
stevedampier@dampierlaw.com

*Counsel for Plaintiff Jimmy Junkins*

Guri Ademi
Shpetim Ademi
David J. Syrios
Corey M. Mather
ADEMI & O'REILLY LLP
3620 East Layton Avenue
Cudahy, Wisconsin 53110
(414) 482-8000
GAdemi@ademilaw.com
SAdemi@ademilaw.com
DSyrios@ademilaw.com
CMather@ademilaw.com

*Counsel for Carol Ann Kashishian*

Patrick E. Cafferty
CAFFERTY FAUCHER LLP

25

101 North Main Street, Suite 565
Ann Arbor, Michigan 48104
(734) 769-2144
pcafferty@caffertyfaucher.com

Douglas G. Thompson
Michael G. McLellan
FINKELSTEIN THOMPSON LLP
James Place
1077 30th Street, N.W., Suite 150
Washington, D.C. 20007
(202) 337-8000
dthompson@finkelsteinthompson.com
mmclellan@finkelsteinthompson.com

*Counsel for Plaintiff Halley Ascher and*
*Counsel for Plaintiff Ifeoma Adams*

Patrick E. Cafferty
CAFFERTY FAUCHER LLP
101 North Main Street, Suite 565
Ann Arbor, Michigan 48104
(734) 769-2144
pcafferty@caffertyfaucher.com

Bryan L. Clobes
CAFFERTY FAUCHER LLP
1717 Arch Street, Suite 3610
Philadelphia, Pennsylvania 19103
(215) 864-2800
bclobes@caffertyfaucher.com

*Counsel for Plaintiff Gary Arthur Herr*

Joseph G. Sauder
Matthew D. Schelkopf
Benjamin F. Johns
CHIMICLES & TIKELLIS LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, Pennsylvania 19041
(610) 642-8500
JGS@chimicles.com
MDS@chimicles.com
BFJ@chimicles.com

Patrick E. Cafferty
CAFFERTY FAUCHER LLP
101 North Main Street, Suite 565
Ann Arbor, Michigan 48104
(734) 769-2144
pcafferty@caffertyfaucher.com

*Counsel for Plaintiff Teresa Ballek*

Paul F. Novak
MILBERG LLP
One Kennedy Square
777 Woodward Avenue, Suite 890
Detroit, Michigan 48226
(313) 309-1760
pnovak@milberg.com

Elizabeth McKenna
MILBERG LLP
One Pennsylvania Plaza, 49th Floor
New York, New York 10119
(212) 631-8605
emckenna@milberg.com

Jeff S. Westerman
MILBERG LLP
One California Plaza
300 South Grand Avenue, Suite 3900
Los Angeles, California 90071
(213) 617-1200
jwesterman@milberg.com

*Counsel for Plaintiff Meredith Heller*

Patrick E. Cafferty
CAFFERTY FAUCHER LLP
101 North Main Street, Suite 565
Ann Arbor, Michigan 48104
(734) 769-2144
pcafferty@caffertyfaucher.com

Kendall S. Zylstra
Jan Bartelli
FARUQI & FARUQI, LLP
101 Greenwood Avenue, Suite 600
Jenkintown, Pennsylvania 19046
(215) 277-5770

27

kzylstra@faruqilaw.com
jbartelli@faruqilaw.com

Eric L. Cramer
Shanon J. Carson
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103
(800) 424-6690
ecramer@bm.net
scarson@bm.net

*Counsel for Plaintiff Peter Brownson*

Jonathan W. Cuneo
Joel Davidow
Preetpal Grewal
Victoria Romanenko
CUNEO GILBERT & LaDUCA, LLP
507 C Street, N.E.
Washington, DC 20002
(202) 789-3960
jonc@cuneolaw.com
Joel@cuneolaw.com
CharlesL@cuneolaw.com

*Interim Co-Lead Counsel for the Automobile Dealer
Actions*

Gregory Johnson
G JOHNSON LAW, PLLC
6688 145th Street West,
Apple Valley, Minnesota 55124
(952) 930-2485
greg@gjohnsonlegal.com

*Counsel for Plaintiff Superstore Automotive, Inc.*

David E. Plunkett
Richard E. Rassel
WILLIAMS, WILLIAMS, RATTNER
& PLUNKETT, P.C.
380 N. Old Woodward Avenue, Suite 300
Birmingham, Michigan 48009
(248) 642-0333
dep@wwrplaw.com
rer@wwrplaw.com

Craig Briskin
MEHRI & SKALET, PLLC
1250 Connecticut Avenue NW, Suite 300
Washington, DC 20036
(202) 822-5100
Cbriskin@Findjustice.com

*Counsel for Plaintiff Ellis Winton McInnis*

Patrick Barrett
BARRETT LAW OFFICE, PLLC
2021 Richard Jones Road, Suite 300
Nashville, Tennessee 37215
(615) 463-4000
pbarrett@barrettlawofficetn.com

Jonathan P. Barrett
BARRETT LAW, PLLC
404 Court Square North
Lexington, Mississippi 39095
(662) 834-2376
jpb@barrettlawpllc.com

*Interim Co-Lead Counsel for the Automobile Dealer
Actions*

Shawn M. Raiter
Larson • King, LLP
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, Minnesota 55101
(651) 312-6500
sraiter@larsonking.com

*Interim Co-Lead Counsel for the Automobile Dealer
Actions*

Gregory P. Hansel
Randall B. Weill
Joshua R. Carver
Megan A. Sanders
PRETI, FLAHERTY, BELIVEAU & PACHIOS
LLP
One City Center
P.O. Box 9546
Portland, ME 04112-9546
(207) 791-3000

ghansel@preti.com
rweill@preti.com
jcarver@preti.com
msanders@preti.com

*Direct Purchaser Interim Co-Lead Counsel*

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
(215) 238-1700
jkohn@kohnswift.com
whoese@kohnswift.com
dabrahams@kohnswift.com

*Direct Purchaser Interim Co-Lead Counsel*

Eugene A. Spector
William G. Caldes
Jeffrey L. Spector
SPECTOR ROSEMAN KODROFF
& WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 496-0300
espector@srkw-law.com
bcaldes@srkw-law.com
jspector@srkw-law.com

*Direct Purchaser Interim Co-Lead Counsel*

Michael J. Freed
Steven A. Kanner
Douglas A. Millen
Michael L. Silverman
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
(224) 632-4500
mfreed@fklmlaw.com
skanner@fklmlaw.com
dmillen@fklmlaw.com
msilverman@fklmlaw.com

30

*Direct Purchaser Interim Co-Lead Counsel*

Patrick E. Cafferty
CAFFERTY FAUCHER LLP
101 North Main St., Ste. 565
Ann Arbor, Michigan 48104
(734)769-2144
pcafferty@caffertyfaucher.com

Barry Taus
Kevin Landau
TAUS, CEBULASH & LANDAU, LLP
80 Maiden Lane, Suite 1205
New York, NY 10036
(212)931-0704
btaus@tcllaw.com
klandau@tcllaw.com

*Counsel for Aaron Brandstein, Tenisha Burgos,
Jason Grala and Bobbie Schwartz*

Elaine A. Ryan
Patricia N. Syverson
Lindsey M. Gomez-Gray
BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
2901 North Central Avenue, Suite 1000
Phoenix, Arizona 85012
Tel: (602) 274-1100

Manfred Muecke
BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
600 West Broadway, Suite 900
San Diego, California 92101
Tel: (619) 756-7748

*Counsel for Plaintiffs Rebecca Lynn Morrow, Erica
Shoaf, Richard Stoehr, and William Picotte*

Terry Gross
Adam C. Belsky
GROSS BELSKY ALONSO LLP
One Sansome Street, Suite 3670
San Francisco, California 94104
(415) 544-0200

31

terry@gba-law.com
adam@gba-law.com

*Counsel for Plaintiff Melissa Barron*

Todd F. Flood
401 N.  Main Street
Royal Oak, Michigan 48067
(248) 547-1032
tflood@floodlaw.com

*Counsel for Plaintiffs Susan LaCava, Sonny Beck,
Curtis P. Boudreaux, Robert Beeson, Tommy N.
Wilson*

Susan G. Kupfer
Joseph Barton
GLANCY BINKOW & GOLDBERG LLP
One Embarcadero Center, Suite 760
San Francisco, California  94111
(415) 972-8160
skupfer@glancylaw.com
jbarton@glancylaw.com

*Counsel for Plaintiff George Nicoud*

*Hassan A.* Zavareei
Lorenzo B. Cellini
TYCKO & ZAVAREEI LLP
2000 L Street, N.W., Suite 808
Washington, D.C. 20036
(202) 973-0900
(202) 973-0950 (fax)
hzavareei@tzlegal.com
lcellini@tzlegal.com

*Counsel for Plaintiff Cindy Prince*